Argued and submitted November 1, 1989, the decision of the Court of Appeals and the judgment of the circuit court affirmed July 17, 1990

## MID-COUNTY FUTURE ALTERNATIVES COMMITTEE,
and Peter M. Smith,
*Petitioners on Review,*

*v.*

## CITY OF PORTLAND,
City of Gresham, Portland Metropolitan Area
Local Boundary Commission, Multnomah County,
and State of Oregon,
*Respondents on Review.*

(TC A8711-06867; CA A48513; SC S36060)

795 P2d 541

Gregory W. Byrne, Portland, argued the cause on behalf of

petitioners on review. With him on the petition was Byrne & Borrow, Portland.

Jeffrey L. Rogers, City Attorney, Portland, argued the cause on behalf of respondent City of Portland.

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause on behalf of respondents Portland Metropolitan Area Local Boundary Commission and State of Oregon. With him on the response were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Matthew R. Baines, Assistant City Attorney, Gresham, argued the cause on behalf of respondent City of Gresham.

Before Peterson, Chief Justice, and Linde,** Carson, Jones,*** Gillette, Van Hoomissen, and Fadeley, Justices.

GILLETTE, J.

---

** Linde, J., retired January 31, 1990.

*** Jones, J., resigned April 30, 1990.

## GILLETTE, J.

This is a declaratory judgment proceeding in which plaintiffs seek a declaration that Oregon Laws 1987, chapter 818, section 3 (codified as ORS 199.534),[1] violates the home rule provisions of the Oregon Constitution, Article XI, section 2,[2] and the equal privileges and immunities clause, Article I, section 20,[3] as well as the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. On cross motions for summary judgment the circuit court denied plaintiffs' motion and granted defendants' motion. The court entered judgment dismissing plaintiffs' complaint and declaring Oregon Laws 1987, chapter 818, section 3, constitutional.

On appeal, the Court of Appeals affirmed the circuit court. *Mid-County Future Alternatives v. City of Portland,* 95 Or App 556, 770 P2d 604 (1989). We allowed review to consider the issues presented in this case together with similar issues already before us in *Donaldson v. Lane County Local Govt. Bdry. Comm.,* 310 Or 168, 795 P2d 549 (1990). We affirm the decision of the Court of Appeals.

---

[1] Oregon Laws 1987, chapter 818, section 3, provides:

"Notwithstanding any other provision of this chapter or ORS chapter 222, territory annexed or transferred to a city or district by a minor boundary change approved by a boundary commission's final order adopted after January 1, 1985, but before the effective date of this 1987 Act shall be in the annexing city or district by operation of this 1987 Act commencing upon the effective date of the boundary commission's final order. The creation by this 1987 Act of annexations shall not void or impair any prior or subsequent minor boundary changes inside or outside of the affected territory."

[2] Article XI, section 2 of the Oregon Constitution currently provides:

"Corporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws. The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, and the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon."

[3] Article I, section 20 provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

# FACTS

The facts of this case are basically undisputed. Plaintiff Peter M. Smith resides in an area of Multnomah County that has been annexed to the City of Portland under the disputed statute. Plaintiff Mid-County Future Alternatives Committee consists of members who live throughout the area subject to the disputed annexations.

The annexations in dispute originally were ordered by the Portland Metropolitan Area Local Boundary Commission, which followed the procedures set forth in ORS 199.495(1),[4] and *former* ORS 199.490(2)(a),[5] the so-called "triple-majority" annexation statutory scheme. The "triple-majority" procedure allows a boundary commission to approve annexation of territory after a city receives a request for the annexation in writing signed by more than half the land owners in the proposed annexation territory, who also own more than half the land in the proposed annexation territory, which in turn represents more than half the assessed value of all land in the proposed annexation territory. Unlike most annexation procedures, the "triple-majority" procedure prevents other landowners or residents from objecting to the annexation and forcing a vote. ORS 199.495(1).

In an earlier case, these same plaintiffs challenged the constitutionality of "triple-majority" annexations and prevailed at the Court of Appeals level. *Mid-County Future*

---

[4] ORS 199.495 provides:

"In a proceeding initiated as provided by ORS 199.490(2) and (5):

"(1) If the proposed annexation is approved by the commission, the final order shall be effective at the time specified in the final order except that the effective date shall not be more than one year after the date the final order is adopted. If no effective date is specified in the final order, the order shall take effect on the date the order is adopted. The order shall not be subject to ORS 199.505."

ORS 199.505 provides for an election approving the annexation by the residents of the area to be annexed if objections to the annexation are filed by a certain number of affected voters.

[5] *Former* ORS 199.490(2)(a) provided:

"An annexation proceeding may also be initiated by a resolution adopted by the governing body of the affected city or district upon receiving consent to annex their land in writing from more than half of the owners of land in the territory proposed to be annexed, who also own more than half of the land in the territory proposed to be annexed and of real property therein representing more than half of the assessed value of all real property in the territory proposed to be annexed."

*Alt. v. Port. Metro. Area LGBC,* 82 Or App 193, 728 P2d 63, *modified,* 83 Or App 552, 733 P2d 451 (1987). We then granted review, but the Oregon Legislature subsequently enacted Chapter 818, section 3, Oregon Laws 1987 — the statute under review here. Because of this enactment, we concluded that the challenge to the "triple-majority" annexation procedure was moot. *Mid-County Future Alt. v. Metro. Area LGBC,* 304 Or 89, 742 P2d 47 (1987). In that decision, we expressed no opinion as to the constitutionality of the "triple majority" annexation procedure or Chapter 818, section 3, Oregon Laws 1987. Shortly thereafter, the plaintiffs initiated this action.

Plaintiffs raise two distinct constitutional challenges to Chapter 818, section 3, Oregon Laws 1987: (1) that the legislative enactment of a boundary change is an amendment to a municipality's charter which is prohibited by the home rule provisions of the Oregon Constitution; and, (2) that this enactment, being a legislative ratification of the earlier "triple majority" annexations, suffers from the same constitutional defect the Court of Appeals found in the earlier annexations. As we shall explain, we find the "home rule" arguments to be irrelevant. The plaintiffs' alternative, right-to-vote theory is not justified by any statutory or constitutional text.

## HISTORICAL BACKGROUND

Historically, in the United States,

"[m]unicipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them * * *. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States."

*Hunter v. City of Pittsburgh,* 207 US 161, 178-79, 28 S Ct 40, 52 L Ed 151 (1907). In Oregon, the state legislature retained this full range of power over municipalities until the enactment of

the home rule provisions of the Oregon Constitution in 1906.[6] *Rose v. Port of Portland,* 82 Or 541, 560-61, 162 P 498 (1917). This pre-1906 situation caused much discontent. Many people perceived the legislature and those who could influence it as politically self-interested rascals and not as statesmen truly concerned with the needs of the people of Oregon.[7]

As a result, the Oregon Constitution was amended in 1906 to include two provisions establishing and protecting local "home rule."[8] Unfortunately, these two provisions created as many problems as they solved. Since 1906, home rule litigation has not long been absent from the courts of this state.[9] Even more troublesome is the fact that this court has not been completely clear as to exactly what the home rule provisions mean. A review of some of the major cases demonstrates the extent of the problem.

In an early home rule case, *Straw v. Harris,* 54 Or 424, 103 P 777 (1909), this court considered the validity of the recent incorporation of a port district that included areas controlled by several small municipalities. The municipalities challenged the creation of the port district, claiming that the

---

[6] Up until 1893, all incorporations of cities were the results of special legislative acts. In 1893, the legislature enacted a general statute permitting self-incorporation. Oregon Laws 1893, page 120. This statute was rarely used prior to the enactment of the home rule provisions of the Oregon Constitution in 1906. *See* Ronchetto and Woodmansee, *Home Rule in Oregon,* 18 Or Law Rev 216 (1939).

[7] *See* the Portland Morning Oregonian, July 16, 1906, page 10, column 1.

[8] Article IV, section 1(5) of the Oregon Constitution currently provides:

"The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district. The manner of exercising these powers shall be provided by general laws, but cities may provide the manner of exercising these powers as to their municipal legislation. In a city, not more than 15 percent of the qualified voters may be required to propose legislation by the initiative, and not more than 10 percent of the qualified voters may be required to order a referendum on legislation."

*See also* Or Const Art XI, § 2 (set out in footnote 2, *infra*).

[9] The first home rule case to reach the Supreme Court was *Farrell v. Port of Columbia,* 50 Or 169, 91 P 546, 93 P 254 (1907). In that case, the court struck down a special law enacted by the legislature incorporating the Port of Columbia. That law, although similar to an earlier, constitutionally valid law creating the Port of Portland, was invalid because it was enacted subsequent to the creation of the home rule provisions of the Oregon Constitution. Consequently, the Oregon legislature no longer had the authority to create municipal corporations by special law. *But see State ex rel Eckles v. Woolley,* 302 Or 37, 726 P2d 918 (1986).

legislature had amended their charters by depriving them of their pre-existing authority over their waterfronts. This court determined that the primary purpose of the home rule amendments was to prevent the legislature from revising, amending, or repealing municipal charters by special law. The legislature could, however, amend such charters by general law. In that case, the port district was created pursuant to a general law allowing the creation of port districts. The court reasoned:

> "Municipalities are but mere departments or agencies of the state, charged with the performance of duties for and on its behalf, and subject always to its control. The State, therefore, regardless of any declarations in its constitution to the contrary, may at any time revise, amend, or even repeal any or all of the charters within it, subject, of course, to vested rights and limitations otherwise provided by our fundamental laws. This, under the constitution as it now stands, may be done by the legislature through general laws only, and the same authority may be invoked by the people through the initiative by either general or special enactments; only the legislature being inhibited from adopting the latter method."

54 Or at 436-37.

Subsequently, in *Kalich v. Knapp,* 73 Or 558, 142 P 594, 145 P 22 (1914), this court held unconstitutional a general Oregon law regulating the speed of vehicles insofar as the law purported to regulate the speed of vehicles inside the City of Portland, where the speed of vehicles was already regulated by a Portland ordinance. Similarly, in *Pearce v. Roseburg,* 77 Or 195, 150 P 855 (1915), the court held that a legislative attempt to "restrict the power of cities and towns to levy taxes [was] antagonistic to Section 2, Article XI, of our present Constitution which gives to cities and towns the power to enact and amend their charters, subject only to the Constitution and criminal laws of the state." *Id.* at 208. According to the court, "[c]ity taxation is entirely a local matter with which the people of the state at large have no concern." *Id.* Therefore, although the state has the authority to enact general laws affecting municipalities, such laws could not limit the power of a city to impose taxes or regulate vehicle speeds.

On the other hand, *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917), held that the home rule provisions of the Oregon Constitution did not inhibit the legislature's

power to enact general laws, even those which significantly affected the charters of cities, towns, and other municipalities.

Later, in *City of Portland v. Welch,* 154 Or 286, 59 P2d 228 (1936), the Supreme Court ignored *Kalich v. Knapp, supra,* and held that a general law limiting the indebtedness or tax levy of municipalities is a valid use of legislative power. However, the court went on to hold that the law in question, as applied to cities in Multnomah County, was a special law because its attempt to treat all four cities in Multnomah County the same regardless of their population was an example of "classification 'run wild'." *Id.* at 300. That is, the law was a special and local act, not a general law.

In *State ex rel Heinig v. Milwaukie et al,* 231 Or 473, 373 P2d 680 (1962), the Supreme Court overturned a general law concerning the employment and discharge practices in municipal fire departments. The court determined that the hiring and firing of members of a municipal fire department is a matter of purely local concern even though the manner of dealing with such personnel may have some effect on affairs outside the city's boundary. According to the court, " 'The real test is not whether the state or the city has an interest in the matter, for usually they both have, but whether the state's interest or that of the city is paramount.' " *Id.* at 481 (citing McDonald, American City Government and Administration, p 79 (3rd ed 1941)).

This balancing test remained in effect until the most recent reinterpretation of Oregon home rule in *La Grande/Astoria v. PERB,* 281 Or 137, 576 P2d 1204 (1978), where this court held that:

> "When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.
>
> "Conversely, a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local community's freedom to choose its own political form. In that case, such a state

law must yield in those particulars necessary to preserve that freedom of local organization."

*Id.* at 156. (Footnote omitted.) Thus, the form and structure of local governments is protected from most state interference, but the state may with greater freedom interfere with local municipalities' substantive laws.

This ambiguous and confusing history of "home rule" decisions provides little guidance to this court, the lower courts, the various municipalities, and the state legislature, in a variety of circumstances. It is of no help in this case because we conclude that the annexations in this case did not implicate city government — and, hence, home rule authority — until after the annexations were complete.

## ANNEXATION

■ One of the earliest annexation cases after the enactment of the home rule provisions was *Thurber v. McMinnville,* 63 Or 410, 128 P 43 (1912). In *Thurber,* this court invalidated an annexation because the voters of the territory to be annexed were not allowed to participate in the election then required by statute. In so holding, the court made it clear that home rule cities do not inherently have the power to annex territory:

> "A majority of this court has never held that a city has the authority, by virtue of the [home rule provisions of the Oregon Constitution], to condemn lands outside of the city limits. On the contrary, we hold that, without express legislative authority granted to all cities of the same class, it has neither power to condemn land for municipal purposes, nor any other extra territorial legislative authority whatever. In the absence of such permission, its attempted legislation outside its limits is as powerless to affect outlying territory as an ordinance passed by the city counsel of Boston would be to regulate the affairs of the town of McMinnville."

*Id.* at 415-16.

The home rule provisions of the Oregon Constitution protect the city from some legislative interference with its internal policies and practices, but they do not grant cities any authority to act outside of their borders. This distribution of power was analyzed and explained by this court as early as 1916:

"Powers exercisable by cities and towns may be placed in two separate classes, which, for the sake of brevity and the want of better terms, will be designated as: (1) Intramural; and (2) extramural. When the legal voters of a city enact municipal legislation which operates only on themselves and for themselves, and which is confined within and extends no further than the corporate limits, then such voters are exercising intramural authority. When, however, the legal voters of a city attempt to exercise authority beyond the corporate limits of their municipality, they are using an extramural power.

"* * * * *

"The legal voters of cities and towns are not obliged to look to the legislature for the right to exercise any intramural power; but the whole sum of intramural authority is set at large, and the legal voters may exercise all of that authority or only such part of it as they may desire, subject, of course, to the Constitution and criminal laws of the state, and subject also to the right of the people of the commonwealth to amend charters or enact supervisory legislation by the use of the initiative: *Robertson v. Portland,* 77 Or. 121 (149 Pac. 545, 547). Extramural authority, however, is not available to the legal voters of cities and towns, unless the right to exercise it has first been granted either by a general law enacted by the legislature or by legislation initiated by the people of the whole state. The right to employ intramural authority finds its source in the language of the Constitution, because the legal voters of cities and towns are by that instrument expressly empowered to enact and amend their own charters; but permission to employ extramural authority must be granted to cities and towns before the privilege can be exercised. One power coexists with the Constitution, while the other power does not exist at all, unless the people of the whole state either grant the authority themselves by the initiative or extend the privilege through their representative, the legislature. * * * Precedents have firmly established the rule that extramural power cannot be employed by cities and towns unless a law exists permitting it, and some prior adjudications have advanced a step further, and held that a general law enacted by the legislature permitting the exercise of extramural power does not by its own force ingraft that power upon the charter of a city, but the general law may be likened to a continuous offer of a power which nevertheless cannot be used until the legal voters of the city have accepted the offer by amending their charter so as to include the proffered power. While it may be *dictum,* still it would seem that there is much force in the contention that, if a city cannot exercise a given

power unless permission is first granted, and if the legislature can lawfully grant that permission, then the legislature may with equal right regulate and supervise the power granted or, unless prevented by the intervention of vested rights, withdraw it entirely."

*State v. Port of Astoria,* 79 Or 1, 17-20, 154 P 399 (1916). (Citations omitted.)

This court subsequently and specifically applied the *Port of Astoria* analysis to an annexation case in *Spence v. Watson,* 182 Or 233, 238, 186 P2d 785 (1947), and went on to hold:

"The conclusion is inescapable that the legislature has the authority to enact a law prescribing the procedure to be followed in determining whether any prescribed area outside of the corporate limits of an incorporated town or city shall be annexed and become a part of such town or city."

Of course, a determination that annexation is within the state's legislative purview does not resolve this case. Even though a city must follow a legislatively-approved procedure to annex territory, it does not follow that the legislature can decree any annexation for any reason.[10] There still is room to argue, as petitioners do, that the borders of a municipal corporation are an integral part of the corporate charter which cannot be altered by the legislature. *See* Or Const, Art. XI, § 2.

Such an argument does not aid petitioners here. Even if we assume that a city's borders are inherently a part of the corporate charter which cannot be altered by the legislature against the municipality's will, we read the charters of both the City of Portland and the City of Gresham as permitting legislative alteration of their borders.[11] The Charter of the

---

[10] Annexations for health hazard reasons under ORS 222.855 are a different matter. Cities are still state agencies subject to certain controls, and the independence of those living outside cities is by no means absolute.

[11] We reject petitioners' argument that no matter what a city's charter may say about its boundaries, any change in the boundaries is an amendment to the charter and therefore beyond the legislature's power. The two cases plaintiff cites for this proposition are not controlling. *Cooke v. Portland,* 69 Or 572, 139 P 1095 (1914), involved a charter that described the city's boundaries by metes and bounds. The charters involved in this case are not so restrictive. *Schmidt et al v. City of Cornelius,* 211 Or 505, 316 P2d 511 (1957), involved an attempt to withdraw territory from a home rule city without the consent of the city. Such a situation is far different from the present case where the legislature seeks to add territory to a city with the city's consent and approval.

City of Portland, Chapter I, Article 2, Section 1-202, provides:

> "The City of Portland may annex additional territory and other cities or areas may be consolidated or merged with the City *in any manner permitted by statute.*"

(Emphasis supplied.) We have no difficulty in concluding that a statutorily-directed annexation of territory is an annexation "permitted by statute."

The Charter of the City of Gresham, Chapter I, section 3, provides:

> "The city shall include all territory encompassed by its boundaries *as they* now exist or *hereafter are modified* by voters, by the council, *or by any other agency with legal power to modify them * * *.*"

(Emphasis supplied.) Although this charter presents a somewhat harder question, we believe that the legislature qualifies as "an agency with the legal power to modify" municipal boundaries. The initial power to decree an annexation still lies where it has always been — with the legislature. *Rosa v. Port of Portland, supra; Hunter v. City of Pittsburgh, supra.* The legislature may choose to exercise, delegate, or ignore this power, but it is the legislature's power.

## ARTICLE I, SECTION 20

■ Plaintiffs contend that Oregon Laws 1987, Chapter 818, section 3, by ratifying the earlier unconstitutional "triple majority" annexations is itself constitutionally flawed. We disagree.

Assuming, without deciding, that the "triple majority" annexation procedure is unconstitutional, as held by the Court of Appeals in *Mid-County Future Alt. v. Port. Metro. Area LGBC, supra,* such unconstitutionality does not affect a subsequent legislative annexation. The present enactment does not purport to derive any authority from the prior act — each stands on its own as an expression of legislative will.

The fact that the present legislation cross-references annexations effected under the former law does not change our view. The cross-reference is only to the property annexed, not to any power exercised. The territories in question have become part of Portland and Gresham, not because an arguably unconstitutional statutory process prevented residents

from voting against the annexations, but because the legislature took an independent look at the situation, exercised its own judgment, and annexed the territories.[12]

## THE RIGHT TO VOTE

■     Finally, petitioners argue the absolute proposition that subjecting them to the legislatively-approved annexations without being permitted to vote on the annexations is impermissible. That proposition does not follow from any specific constitutional language or from anything we have thus far enunciated in this opinion concerning the legislature's plenary authority to legislate concerning annexations, but plaintiffs rely on the following language from *Reilley v. Secretary of State,* 288 Or 573, 579, 607 P2d 162 (1980): "[T]he legislature may not impose a new local government apparatus on a selected group of citizens, without giving those people a chance to approve or veto the proposal."

In *Reilley,* this court held that the legislature did not violate Article XI, section 2, in reorganizing the Metropolitan Service District (a district covering parts of Multnomah, Washington and Clackamas Counties and many of the cities found therein) because the district's reorganization had been submitted to the affected voters for approval. *Id.* at 581. The comment on which the petitioners rely thus is a *dictum,* because there had been a vote in that case. Moreover, the *dictum* may not even have been an appropriate one under the

---

[12] Plaintiffs also claim support from the decision of the legislative counsel to specifically enumerate those sections amended by the Or Laws 1987, ch 818, especially ORS 199.490, in the codified version of ch 818, § 3. The codification at ORS 199.534 reads:

"Notwithstanding any other provision of this chapter or ORS chapter 222, territory annexed or transferred to a city or district by a minor boundary change approved by a boundary commission's final order adopted after January 1, 1985, but before *July 18, 1987,* shall be in the annexing city or district by operation of *ORS 198.855, 199.490, 199.531, 199.534, 222.120 and 222.170 to 222.177* commencing upon the effective date of the boundary commission's final order. The creation by *ORS 198.855, 199.490, 199.531, 199.534, 222.120 and 222.170 to 222.177* of annexations shall not void or impair any prior or subsequent minor boundary changes inside or outside of the affected territory."

(Italicized materials changed in codification.) Plaintiffs argue that by making explicit reference to ORS 199.490 the legislation demonstrates its reliance on the validity of the underlying boundary commission orders. That is not the case. Even though *former* ORS 199.490 was the "triple majority" annexations section, current ORS 199.490 was amended to create a significantly different procedure and, in any case, ORS 199.534 does not depend on either section for its validity.

facts of that case, inasmuch as a majority of one of the involved political subsidiaries (Clackamas County) had voted *against* the reorganization. *Id.* at 576.

This court also suggested that vote by those who were to be annexed into a governmental unit was constitutionally required in *Thurber v. McMinnville, supra.* The *Thurber* court declared that "the right of the people of the district or territory sought to be annexed to be permitted to vote upon the question under some method is a constitutional one that cannot be taken away." 63 Or at 417. As the *Thurber* case concerned a statute granting the right to vote on an annexation, its broad constitutional holding was a *dictum.* Furthermore, *Thurber* cited no authority for the holding, which is not a surprise because there is none. There is no federal constitutional right to vote on municipal annexations. *Hunter v. City of Pittsburgh, supra.* We are also unable to find any such right in the Oregon Constitution. *Thurber's* broad statement concerning the constitutional right to vote on annexation is disavowed. A similar suggestion in *Landess v. City of Cottage Grove,* 64 Or 155, 129 P 537 (1913) is also disavowed. *State ex rel v. Port of Tillamook,* 62 Or 332, 342, 124 P 637 (1912) was cited by the court in *Landess* as support for this proposition, but, in fact, the *Port of Tillamook* court merely stated that municipalities had no innate authority to annex territories without the consent of the legal voters residing in the area to be annexed. The people of the state as a whole, on the other hand, could pass a law permitting such an annexation. *Id.* at 342-43.

Petitioners are mistaken when they assert that they must, as a matter of constitutional law, be allowed to vote on any annexation to which they might be subjected. To allow such a vote may be commendable public policy. To allow it may even be constitutionally mandated, if a vote is given to some who will (or whose property will) be annexed while it is not given to others similarly situated. *See* the Court of Appeals earlier opinion in *Mid-County Future Alt. v. Port Metro. Area LGBC, supra.* But desirability in some circumstances, or even constitutional necessity in others, does not demonstrate constitutional necessity in *all* circumstances. We hold that there is no such automatic right to vote on extension of city authority over property one either owns or occupies

where, as in the present case, the legislature has itself created the extension.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.