Argued and submitted January 15, 1999, affirmed May 24, 2000

SHERWOOD SCHOOL DISTRICT 88J,
Mark Christie, Sherry Taxer,
Fred Macklin and Donna Macklin,
*Appellants,*

*v.*

WASHINGTON COUNTY EDUCATION
SERVICE DISTRICT,
Tigard-Tualatin School District 23J,
State of Oregon,
Laura Aust and Ralph Cellarius,
*Respondents.*

(C960048CV; CA A93854)

6 P3d 518

374

Helen T. Dziuba argued the cause and filed the briefs for appellants.

Christine A. Chute, Assistant Attorney General, argued the cause for respondents State of Oregon and Tigard-Tualatin School District 34J. With her on the brief were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, Derryck H. Dittman, and Anderson & Dittman, LLP.

Diana E. Godwin argued the cause for respondents Laura Aust and Ralph Cellarius.

E. Andrew Jordan waived appearance for respondent Washington County Education Service District.

Before Landau, Presiding Judge, and Deits, Chief Judge,* and Edmonds, Judge.

LANDAU, P. J.

Affirmed.

---

* Deits, C. J., *vice* Rossman, S. J.

**LANDAU, P. J.**

At issue in this case is the constitutionality of a state law that alters the boundary of a local school district. The case was submitted to the trial court on stipulated facts, and the trial court concluded that the boundary change effected by the state law was constitutional. We agree and affirm.

The dispute concerns a 333-acre parcel of land known as the "Hedges Creek subdivision," located in the southernmost corner of the city of Tualatin. Two school districts are located in Tualatin: the Tigard-Tualatin School District and the Sherwood School District. Before 1995, the Tigard-Tualatin School District served nearly all of the city; indeed, the only portion of Tualatin not within the Tigard-Tualatin School District was the Hedges Creek subdivision.

Some parents living in the Hedges Creek subdivision sought permission from the Sherwood School District to send their children to schools in the Tigard-Tualatin School District. The nearest Tigard-Tualatin School District schools are located much closer to the Hedges Creek subdivision than are the nearest schools in the Sherwood School District, located some four to five miles away. The Sherwood School District, however, did not grant the requested permission. There followed various efforts of the parents and others to remove the Hedges Creek subdivision from the Sherwood School District and to have it made part of the Tigard-Tualatin School District. All of those efforts proved unsuccessful.

In 1995, the supporters of removing the Hedges Creek subdivision from the Sherwood School District sought help from the legislature. The legislature ultimately responded by adding to an existing bill concerning education service districts generally a specific section concerning the alteration of the Sherwood and Tigard-Tualatin School District boundaries. The legislative history of the amendment makes clear that the principal purpose of the amendment was to bring an end to a long-standing dispute that the legislature concluded could not be resolved by existing dispute procedures. Supporters also suggested that the amendment was necessary to reduce traffic congestion in the area and to

"send a message" to local districts that if they cannot resolve such disputes themselves, the legislature will be forced to intervene. The text of the amendment, commonly referred to as "Section 22," because it was added as Section 22 of Senate Bill 262, provides, in part:

"(1) A district boundary board shall approve a request or petition for a minor boundary change involving only the Sherwood and Tigard-Tualatin School Districts in Washington County when:

"(a) A majority of the electors residing in the affected area petition the district boundary board to make the change;

"(b) No student in the affected area lives more than one mile from an existing boundary between the affected school districts;

"(c) The nearest school for the students in the affected area is located in the school district into which the affected area will be transferred; and

"(d) The school board of the school district into which the affected area will be transferred approves the minor boundary change.

"(2) Notwithstanding ORS 330.101 [requiring notice and opportunity to remonstrate against proposed boundary changes], for any minor boundary change for a school district approved as required by this section, no remonstrance petition or election shall be allowed.

"* * * * *

"(5) As used in this section:

"(a) 'Affected area' means the territory proposed to be moved from one school district to another school district in a request or petition for a minor boundary change.

"(b) 'Minor boundary change' means a school district boundary change that:

"(A) Involves no more than two school districts;

"(B) Involves only one education service district;

"(C) Does not include in the affected area any real property owned or leased by the school district that currently serves the affected area;

"(D)  Does not include any industrial property in the affected area; and

"(E)  Involves an affected area that is not larger than 350 acres and that represents not more than five percent of the total real market value of all real property within the school district that currently serves the affected area."

Or Laws 1995, ch 611, § 22, *compiled as a note after* ORS 330.310.

Following the enactment of Section 22, plaintiffs— the Sherwood School District and several area voters whose children attend school within that district—initiated this action for declaratory and injunctive relief, challenging the constitutionality of the law. Plaintiffs allege that Section 22 is unconstitutional on four grounds: (1) It violates Article IV, section 23, of the Oregon Constitution, because it is a special law that provides for supporting common schools and the preservation of school funds; (2) it violates Article I, section 20, of the Oregon Constitution, because plaintiffs have been deprived of the right to vote on a school district boundary change without a sufficient justification; (3) it violates the voting rights provisions of Article II, sections 2 and 8, and Article VIII, section 6, of the Oregon Constitution, for the same reason; and (4) it violates the equal protection clause of the Fourteenth Amendment to the United States Constitution, for the same reason. Defendants—the Washington County Education Service District, the Tigard-Tualatin School District, the State of Oregon and one of the parents residing in the Hedges Creek subdivision—answered, denying the unconstitutionality of Section 22. The parties negotiated a statement of stipulated facts and submitted the matter to the trial court on cross-motions for summary judgment. The trial court upheld the constitutionality of Section 22 in all respects.

On appeal, plaintiffs assign error to the trial court's denial of their motion for summary judgment and its decision to grant defendants' motion. Because there are no disputed issues of fact, we review the trial court's decision to determine if either party is entitled to judgment as a matter of law. *Stephens v. Bispham*, 316 Or 221, 223, 851 P2d 556 (1993).

■      We begin with plaintiffs' argument that Section 22 violates Article IV, section 23, of the Oregon Constitution. In

evaluating that argument, we examine the text of the relevant constitutional provision, its historical context, and any judicial decisions pertaining to it. *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

Article IV, section 23, provides, in part:

"The Legislative Assembly, shall not pass special or local laws, in any of the following enumerated cases, that is to say:

"Regulating the jurisdiction, and duties of justices of the peace, and of constables;

"For the punishment of Crimes, and Misdemeanors;

"Regulating the practice in Courts of Justice;

"Providing for changing the venue in civil and Criminal cases;

"Granting divorces;

"Changing the names of persons;

"For the laying, opening, and working on highways, and for the election, or appointment of supervisors;

"Vacating roads, Town plats, Streets, Alleys, and Public squares;

"Summoning and empaneling (sic) grand, and petit jurors;

"For the assessment and collection of Taxes, for State, County, Township, or road purposes;

"Providing for supporting Common schools, and for the preservation of school funds[.]"

Plaintiffs argue that the adjustment in the school boundary between the Sherwood and Tigard-Tualatin School Districts required by Section 22 removes certain real property from the Sherwood School District, and, as a result, that district suffers a reduction in real property tax revenues that it once recovered from taxation of the property when it was within district boundaries. Because the effect of Section 22 is to reduce revenues to the Sherwood School District, plaintiffs argue, the law offends Article IV, section 23. Plaintiffs acknowledge that the revenue reduction is only an indirect

effect of the enactment of Section 22. Nevertheless, relying principally on Indiana case law, plaintiffs argue that the prohibition of Article IV, section 23, was intended to prohibit any special or local law that affects—directly or indirectly—the state system of funding public schools.

Defendants acknowledge that Section 22 is a special or local law, but they insist that it is not the sort of special or local law that is prohibited by Article IV, section 23. They argue that, when viewed in the context of other constitutional provisions and relevant cases concerning public schools and public school funding, Article IV, section 23, properly may be seen as a more narrow prohibition against directly providing funds to one school district not made available to others.

Prohibitions against enactment of certain special or local laws such as the ones contained in Article IV, section 23, of the Oregon Constitution, were a common feature of mid-nineteenth century constitutions, reflecting widespread concern with the power of state legislatures to grant special privileges. Before the Civil War, legislatures commonly—if not indiscriminately—devoted their attentions to private bills authorizing specific corporations to construct canals, roads, and bridges; granting corporate charters; granting divorces; granting adoptions; allowing bankruptcies, and the like. During the 1849 and 1850 sessions of the Indiana Legislature, for example, over 90 percent of the laws passed by the legislature were special or local laws. Frank E. Horack & Matthew E. Welsh, *Special Legislation: Another Twilight Zone*, 12 Ind LJ 109, 115-16 (1936). By the mid-nineteenth century, state constitution-makers became concerned about the unfettered authority of the state legislatures to grant such individual benefits and privileges. *See generally* G. Alan Tarr, *Understanding State Constitutions*, 119-21 (1998) (tracing origins of local and special law prohibitions to early nineteenth century concern with abuse of legislative power); *see also* Charles C. Binney, *Restrictions upon Local and Special Legislation in State Constitutions*, 6-7 (1894) (describing nineteenth-century "growth of a very general feeling of hostility to all local and special legislation"); Amasa M. Eaton, *Recent State Constitutions*, 6 Harv L Rev 109, 109 (1892) ("One of the most marked features of all recent State constitutions is the

distrust shown of the Legislature."). The result was the addition of special and local law prohibitions in new and revised state constitutions.

The portion of Article IV, section 23, at issue in this case concerns local or special laws "[p]roviding for supporting Common schools, and for the preservation of school funds." There is no debate that the challenged statute in this case is a local or special law; the question for us is the scope of that prohibition, that is to say, whether it prohibits local or special legislation that merely affects—directly or indirectly—the subject of school funding or instead prohibits more narrowly the direct award of funds to some schools and not to others.

It must be recalled that the 1859 Oregon Constitution charged the Legislative Assembly with the responsibility of establishing "a uniform, and general system of Common schools," Or Const, Art VIII, § 3, and, to fund such a system, provided for the creation of a common school fund derived from the proceeds of state educational land grants and other grants of land and property to the state. Or Const, Art VIII, § 2. The proceeds from the common school fund were to be distributed to the counties in proportion to the number of school-aged children residing in each county. Or Const, Art VIII, § 4. In light of the emphasis on the uniformity of the state school system, it certainly is arguable that the framers of the Oregon Constitution would have understood any provision relating to school funding apart from the common school fund to run afoul of Article IV, section 23.

In fact, that is how the Indiana Supreme Court construed the provision of the Indiana Constitution from which Article IV, section 23, was taken. In *City of Lafayette v. Jenners*, 10 Ind 70 (1857), the court held that a state statute providing local governments with the authority to levy taxes for the support of local schools apart from the funds derived from the common school fund violated the provision of the Indiana Constitution prohibiting the enactment of local and special laws providing for the support of common schools. The court held that one of the reasons for the prohibition against local or special laws providing for the support of common schools was the enactment of another provision establishing a uniform system of schools to be funded out of a common school

fund and that permitting local governments to supplement that state funding would jeopardize the uniformity that the constitution required. Subsequent decisions of the Indiana courts reflect, as plaintiffs suggest, a similarly broad reading of the scope of that state's prohibition against special or local legislation. *Indiana Gaming Comm'n v. Moseley*, 643 NE2d 296, 299 (Ind 1994); *Donaldson v. State*, 101 NE 485, 492 (Ind 1913); *School City of Rushville v. Hayes*, 70 NE 134, 137 (Ind 1904).

The Indiana case law, however, is of little significance to our analysis of Article IV, section 23. To begin with, the decisions on which plaintiffs rely postdate the adoption of the Oregon Constitution. *See Priest*, 314 Or at 418-19 (Indiana court decisions construing the Indiana Constitution after Oregon statehood "do not establish the meaning of the earlier-adopted language in the Oregon Constitution"). The *City of Lafayette* decision arguably predates the adoption of the Oregon Constitution, having been decided in November 1857, the same month that the voters in Oregon ratified the state's first constitution. But even that decision does not control our construction of Article IV, section 23, because we do not view the construction of a constitutional provision in an artificial linguistic or historical vacuum. The fact is that, since the adoption of Article IV, section 23, the Oregon Constitution has been amended and interpreted in ways that bear on the scope of that provision. *See Coultas v. City of Sutherlin*, 318 Or 584, 590, 871 P2d 465 (1994) (context is helpful in ascertaining the meaning of constitutional text); *see also Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 811 P2d 116 (1991) (examining recent amendments in determining constitutionality of property tax-based method of public school funding).

First, public school financing in Oregon has become more complex since the enactment of the constitution in 1857. Among other things, funding from local property tax revenues became a prominent feature of the system of public school finance. In 1987, the voters approved a constitutional amendment, known as the "safety net," expressly ratifying the financing of public schools with local property taxes. The safety net provided that, when local school funding is inadequate to meet current operating expenses, school districts are

authorized, without voter approval, to levy property taxes in an amount not more than what was levied for operating purposes in the preceding year. *Former* Or Const, Art XI, § 11a (1989), *repealed by* Or Const, Art XI, § 11. Three years later, the voters approved another constitutional amendment, commonly referred to as "Measure 5," which imposes limitations on the rates at which local districts may tax real property and provides—at least for a limited period of years—that the state must replace from the general fund revenue lost to the public school system as a result of the limitations. Or Const, Art XI, § 11b.

Second, the Oregon Supreme Court has determined that the guarantee of a "uniform" system of common schools provided in Article VIII, section 3, does not mean that levels of local school funding must be precisely equal; indeed, that section does not pertain to school funding at all. To the contrary, the court held, Article VIII, section 3, requires only that the education system must be uniform "in terms of prescribed course of study and educational progression from grade to grade." *Olsen v. State ex rel Johnson*, 276 Or 9, 27, 554 P2d 139 (1976) (quoting *Serrano v. Priest*, 5 Cal 3d 584, 595-96, 96 Cal Rptr 601, 487 P2d 1241 (1971)). *See also Withers v. State of Oregon*, 133 Or App 377, 384, 891 P2d 675, *rev den* 321 Or 284 (1995) (stating that *Olsen* holds that Article VIII, section 3, requires only a uniform prescribed course of study).

The reasoning in *Olsen* has been questioned often, most recently in *Coalition for Equit. School Fund.* In that case, however, the Supreme Court held that the matter had been rendered academic by the enactment of the "safety net" and Measure 5, both of which, in effect, "constitutionalized" the practice of financing public schools with local property taxes. As a result, the court held, the uniform schools provisions no longer can be read to forbid disparities in funding that inevitably result from financing public schools with local property tax revenues.

Third, the Supreme Court also has held that a necessary incident of the legislature's authority to establish a uniform and general system of common schools is the authority to establish or change the boundaries of school districts.

The boundaries of school districts, the court has held, "are legislative determinations. The boundaries may be established or changed at the will of the legislature or at the will of the agency which the legislature has authorized to make such decisions." *Phillippi v. Board of Education*, 245 Or 446, 448, 442 P2d 265 (1967). *See also School Dist. 7 v. Weissenfluh*, 236 Or 165, 171, 387 P2d 567 (1963) ("an alteration of school district boundaries is a legislative decision"); *Evans v. Hurlburt*, 117 Or 274, 276-77, 243 P 553 (1926) (legislature may delegate power to "establish, change the boundaries of, or abolish school districts"). Indeed, the legislature has the authority to create, alter, or abolish school districts with or without a vote of the people within the area involved. *School Dist. No. 1 v. Linn Boundary Bd.*, 244 Or 207, 215, 416 P2d 656 (1966); *Padberg v. Martin*, 225 Or 135, 138, 357 P2d 255 (1960).

■ Thus, the reasoning of the Indiana case law—in particular, the *City of Lafayette* decision—simply does not apply. The underpinning of that decision was the importance of uniformity in school funding as a function of the uniform schools clause of that state's constitution. The constitutional system of public school finance in Oregon is substantially different from the system in effect in Indiana in 1857. The case law in Oregon makes clear that the system of real property taxation that was prohibited in *City of Lafayette* is constitutional in Oregon and that the uniform schools provision of the Oregon Constitution does not require uniformity of school funding.

■ In light of the foregoing contextual analysis, plaintiffs' proposed reading of Article IV, section 23, becomes untenable. The suggestion that a boundary change that incidentally affects school funding is a prohibited special or local law runs squarely against the settled principle of constitutional law that the legislature has plenary authority to determine the boundaries of local school districts. It also cannot be reconciled with the practical reality that, because of the nature of the system of school finance as constitutionally prescribed in this state, *any* school district boundary change inevitably will have an effect on the funding of schools among all districts whose boundaries have been changed. Any boundary change, for example, will shift taxable property

from one school district to another. That means that the property tax base of one school district will increase, while the tax base of another will correspondingly decrease. In a system of public school funding that relies on property taxation, such a result is wholly unavoidable.

■    The only plausible reading of Article IV, section 23, is that it prohibits the legislature from enacting laws that grant direct financial support to one or more school districts that is not made available to all school districts. Only that narrower reading keeps faith with the original nineteenth-century concern with conferring special benefits on a select few, while preserving the constitutional authority of the state to maintain a uniform system of common schools, including the authority to create, alter, even abolish, individual school districts.

■    Section 22 does not amount to a direct grant of funds to any school district. It amounts to an alteration of a boundary between two school districts, pursuant to the legislature's constitutional authority under Article VIII, section 3. The fact that there are indirect financial consequences to the boundary change does not render the law a special or local law "providing for supporting common schools, and for the preservation of school funds." We conclude that the trial court did not err in holding that Section 22 does not violate Article IV, section 23.

We next address plaintiffs' contention that Section 22 violates Article I, section 20, of the Oregon Constitution, which provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens." According to plaintiffs, Section 22 eliminates their right to remonstrate against the legislative alteration of the school boundary between the Tigard-Tualatin and Sherwood School Districts and thus deprives them of a right that is available to all other citizens by statute. See ORS 330.101(2). Relying primarily on *Mid-County Future Alt. v. Port. Metro. Area LGBC*, 82 Or App 193, 728 P2d 63 (1986), *rev dismissed* 304 Or 89 (1987), plaintiffs argue that no legitimate legislative purpose justifies the deprivation of their right to remonstrate. Defendants argue that legislation such as Section 22 that makes

distinctions on the basis of geographic location must be upheld so long as the distinctions have a rational basis. In this case, they argue, Section 22 is rationally related to a legitimate legislative aim of resolving a long-standing acrimonious dispute between school districts. We agree with defendants.

■ At the outset, we note that Article I, section 20, applies only to a "citizen or class of citizens." Plaintiff Sherwood School District is neither a citizen nor a class of citizens and therefore may not claim a violation of the protection that Article I, section 20, affords. *See Hale v. Port of Portland*, 308 Or 508, 524, 783 P2d 506 (1989) (stating that cities and instrumentalities of the state are not citizens for the purposes of Article I, section 20).

We turn then to the contentions of the remaining individual plaintiffs. Article I, section 20, is generally understood to express two separate prohibitions. As the Supreme Court explained in *State v. Clark*, 291 Or 231, 237, 630 P2d 810, *cert den* 454 US 1084 (1981), the clause "forbids inequality of privileges or immunities not available upon the same terms, first, to any citizen, and second, to any class of citizens." The contentions in this case fall into the latter class; plaintiffs argue that they are members of a class of citizens—defined by geographic location—to whom certain privileges—the right to remonstrate against a school district boundary change—are not made available under Section 22.

■ To prevail on such a claim, plaintiffs must show that they are indeed members of a true "class" of citizens, that the statute discriminates against the class on the basis of the characteristics that define the class, and that the discrimination is not justifiable. *Withers v. State of Oregon*, 163 Or App 298, 306, 987 P2d 1247 (1999) (quoting *Jungen v. State of Oregon*, 94 Or App 101, 105, 764 P2d 938 (1988), *rev den* 307 Or 658, *cert den* 493 US 933 (1989)). What constitutes an acceptable justification for class-based discrimination depends on the nature of the classification involved. *Tanner v. OHSU*, 157 Or App 502, 523, 971 P2d 435 (1998). Ordinarily, disparate treatment of classes will be upheld if there is a rational basis for the disparity, but if the disparity is a result

of a "suspect" classification, the disparity is subject to a more demanding examination. *Id.*

In this case, there is no question that plaintiffs are members of a true class for Article I, section 20, purposes; they are subject to disparate treatment on the basis of their geographic residence. Our decision in *Withers* is directly on point. In that case, the plaintiffs were residents in a particular school district who complained about disparities in funding between school districts. We held that the plaintiffs were members of a true class under Article I, section 20. 163 Or App at 308.

There also is no question that plaintiffs are subject to different treatment on the basis of their membership in the class, that is to say, on the basis of their geographic location within one of the two school districts subject to Section 22's prohibition against remonstrating against a boundary change between those districts; residents in other school districts are permitted to remonstrate against school district boundary changes. ORS 330.101(2). The only debate is whether the difference in treatment is justifiable. No one contends that differences in treatment on the basis of geographic location trigger a more demanding suspect classification analysis, and, in any event, our decision in *Withers* makes clear that such differences in treatment are subject to rational basis analysis only. 163 Or App at 308. We therefore turn to the question whether the difference in treatment in this case—the deprivation of the right to remonstrate—has a rational basis.

To survive rational basis analysis, it must be shown that "the classification involved bear[s] some relationship to a legitimate end." *Withers*, 163 Or App at 309. In conducting the analysis, we are not limited to the purpose of the statute as reflected in its language or legislative history. Instead, we determine whether there is *any* rational basis for the legislation. *Southern Wasco County Ambulance v. State of Oregon*, 156 Or App 543, 552 n 4, 968 P2d 848 (1998), *rev den* 328 Or 330 (1999); *Kmart Corp. v. Lloyd*, 155 Or App 270, 277, 963 P2d 734 (1998).

A "legitimate" legislative end similarly is broadly construed. The authority of the legislature to choose an objective for legislation is "plenary," subject only to the limitations that the state or federal constitutions impose. *See State v. Moyle*, 299 Or 691, 699, 705 P2d 740 (1985) ("In principle, legislative power to select the objectives of legislation is plenary, except as it is limited by the state and federal constitutions."). That is because the state constitution does not grant the legislature authority but, rather, only limits it. As the Supreme Court explained in *Jory v. Martin*, 153 Or 278, 284-85, 56 P2d 1193 (1936):

> "We must also remember that our constitution, like all other state constitutions is not to be regarded as a grant of power but rather as a limitation upon the powers of the legislature and that the people, in adopting it, committed to the legislature the whole lawmaking power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature, for all purposes of civil government, is the rule, and a prohibition to exercise a particular power is an exception."

With those principles in mind, we turn to Section 22. The legislative history of Section 22 reveals that its purposes included the resolution of a long-standing dispute between residents in the Tigard-Tualatin and Sherwood School Districts and the revision of school boundaries to produce a safer and more efficient traffic flow in the affected areas. Plaintiffs do not explain—and we do not understand—why those are not legitimate legislative ends. Plaintiffs' sole argument is that there is evidence in the legislative history—in particular, statements of opponents of Section 22—that the asserted purposes of Section 22 were merely pretextual and that the *real* reason for the legislation was merely that the more wealthy residents of the Tigard-Tualatin School District were able to muster sufficient political support "to hose the Sherwood School District" and serve their private interests. In making that argument, however, plaintiffs misperceive our role. We do not attempt to psychoanalyze the motives of legislators to determine whether the passage of a given bill actually was motivated by interest group politics. The role of the courts in evaluating the constitutionality of legislation under Article I, section 20, is considerably more deferential

than that. We determine whether there is *any* rational basis for the distinction drawn by the legislature, whether or not it was a basis that the legislature even considered. *Southern Wasco County Ambulance*, 156 Or App at 552.

Our decision in *Mid-County* is not to the contrary. At issue in that case was the constitutionality of a statute that permitted the annexation of an area without an election upon the satisfaction of three conditions: (1) that half of the *landowners*—not the residents—in the affected area provided written consent to the annexation; (2) that those landowners owned more than half the land in the affected area; and (3) that the value of those lands represented more than half of the assessed value of all lands in the affected area. The plaintiffs, residents who did not own land in the affected area, challenged the constitutionality of the statute under Article I, section 20. We held that the statute was unconstitutional, but we did so because, on balance, the interest of the state was simply not sufficiently compelling when weighed against the right to vote in annexation matters that ordinarily is available to residents of an affected area. *Mid-County*, 82 Or App at 199-200. The sort of balancing test that this court employed in *Mid-County* has since been explicitly abandoned. *Hale*, 308 Or at 524 ("This is a test drawn from federal equal protection doctrine (and akin to 'balancing') that for the purposes of Article I, section 20, has been suspended by our more recent decisions."). *Mid-County* no longer can be regarded as good law. We therefore conclude that the trial court did not err in holding that Section 22 does not violate Article I, section 20.

■    We next consider plaintiffs' contention that Section 22 violates the voting rights provisions of Article II, sections 2 and 8, and Article VIII, section 6, of the Oregon Constitution. Article II, section 2, provides, in part:

"(1)  Every citizen of the United States is entitled to vote in all elections not otherwise provided for by this Constitution if such citizen:

"(a)  Is 18 years of age or older;

"(b)  Has resided in this state during the six months immediately preceding the election * * *; and

"(c) Is registered not less than 20 calendar days imme-
diately preceding any election in the manner provided by
law."

Article II, section 8, provides:

"The Legislative Assembly shall enact laws to support
the privilege of free suffrage, prescribing the manner of reg-
ulating, and conducting elections, and prohibiting under
adequate penalties, all undue influence therein, from
power, bribery, tumult, and other improper conduct."

Article VIII, section 6, provides:

"In all school district elections every citizen of the
United States of the age of twenty-one years and upward
who shall have resided in the school district during the six
months immediately preceding such election, and who shall
be duly registered prior to such election in the manner pro-
vided by law, shall be entitled to vote, provided such citizen
is able to read and write the English language."

Plaintiffs argue that each of the foregoing constitutional pro-
visions has been abrogated by the enactment of Section 22,
because that law deprives them of the right to demand an
election on the revision of the school boundaries in their area.

■ Plaintiffs' contentions may be easily answered. None
of the provisions of the Oregon Constitution creates a right to
demand an election in any circumstance. Each merely
describes *who* may vote in elections and *how* elections must
be conducted. Indeed, as we have explained above, the
Supreme Court has held that there is no constitutional right
to demand an election on the revision of a school district
boundary. *School Dist. No. 1*, 244 Or at 215; *Padberg*, 225 Or
at 138.

Plaintiffs insist that Section 22's "impingement on
fundamental rights" cannot be "explained away" by resorts to
"platitudes" and "irrelevant concepts like the legislature's
plenary power over school district boundaries." According to
plaintiffs, where a "fundamental right" such as voting is
involved, "a higher level of scrutiny applies." Cited as author-
ity for plaintiffs' argument is *Portland v. Coffey*, 67 Or 507,
135 P 359 (1913). Plaintiffs' insistence that we apply strict

scrutiny to laws that affect a fundamental right simply cannot be reconciled with current law, however. Perhaps the Oregon courts once engaged in such analysis. They do so no longer. *Hale*, 308 Or at 524. We conclude that the trial court did not err in holding that Section 22 does not violate the voting rights provisions of Article II, sections 2 and 8, and Article VIII, section 6.

Finally, we address plaintiffs' contention that Section 22 violates the Fourteenth Amendment to the United States Constitution, which provides that no state may "deny to any person within its jurisdiction the equal protection of its laws." According to plaintiffs, Section 22 denies them a right to remonstrate, a right that is made available to residents in other school districts. Because the denial of the right to vote is the denial of a fundamental right, plaintiffs argue, Section 22 may be upheld only upon a demonstration of a compelling state interest. Such an interest, they conclude, simply has not been shown in this case. Defendants argue that there has been no deprivation of a fundamental constitutional right, because there is no constitutional right to vote on school district boundary changes.

■■■ Under the Equal Protection clause of the Fourteenth Amendment, a statute that differentiates on the basis of a suspect classification or that infringes on fundamental rights is subject to "strict scrutiny," that is to say, it will be sustained only if the difference in treatment is "suitably tailored to serve a compelling state interest." *Cleburne v. Cleburne Living Center, Inc.*, 473 US 432, 440, 105 S Ct 2349, 87 L Ed 2d 313 (1985). A statute that does not differentiate on the basis of a suspect classification and does not infringe on a fundamental right is subject to "rational basis" review, which requires only that there be a conceivable, rational relationship between the difference in treatment and some legitimate legislative purpose. *Heller v. Doe*, 509 US 312, 320, 113 S Ct 2637, 125 L Ed 2d 257 (1993).

■ In this case, plaintiffs have not been denied a fundamental constitutional right. As we have noted, there is no constitutional right to vote on local school boundary changes. *E.g.*, *School Dist. No. 1*, 244 Or at 215; *Padberg*, 225 Or at 138. *See also Mid-County Future Alternatives Comm. v. City*

*of Portland*, 310 Or 152, 166, 795 P2d 541, *cert den* 498 US 999 (1990) ("There is no federal constitutional right to vote on municipal annexations. We are also unable to find any such right in the Oregon Constitution."). Plaintiffs acknowledge that they do not have a constitutional right to vote on school boundary decisions. They insist, however, that, once the state permits anyone to vote on school district boundary changes, it cannot deny the right to anyone else in the absence of a compelling justification. In support of their argument, plaintiffs rely on *Kramer v. Union Free School District No. 15*, 395 US 621, 89 S Ct 1886, 23 L Ed 2d 583 (1969), and *Hussey v. City of Portland*, 64 F3d 1260 (9th Cir 1995).

Plaintiffs read too much into *Kramer*. In that case, a New York statute provided that, in certain school districts, school board members were to be elected only by those people in the district who either own property or have children enrolled in the district. In other districts, all qualified voters were entitled to vote on school board membership. In still other districts, school board members were appointed. A resident in the first category of districts who neither owned property nor had children enrolled in the district challenged the constitutionality of the statute that imposed those qualifications on the right to vote on the membership of the school board. The Court held that, once it is determined that an election will be held, the decision as to who may vote *in that election* is subject to strict scrutiny. The court drew a distinction between deciding who may vote in an election and deciding whether an election will be held at all. Thus, the court held, although it may be permissible to appoint school board members without an election in some districts, in those districts in which an election is held, restrictions on the franchise are subject to strict scrutiny. 395 US at 626-27.

Plaintiffs similarly read *Hussey* too broadly. At issue in that case was the constitutionality of a City of Portland ordinance that offered a sewer connection subsidy to residents who signed irrevocable consents to annexation. Several residents challenged the ordinance on the ground that it amounted to an impermissible interference with the right to vote. The City argued that there is no constitutional right to vote on annexation. The Court of Appeals for the Ninth Circuit agreed, but held that the lack of a constitutional right to

vote was beside the point. "[O]nce citizens are granted the right to vote on a matter, *the exercise of that vote* becomes protected by the Constitution even though the state was not obliged to allow any vote at all." *Hussey*, 64 F3d at 1263 (emphasis added). The court then held that, because the city offered no compelling justification for imposing a condition on the right to vote, that is, giving up a sewer connection subsidy, the ordinance was unconstitutional. As in *Kramer*, the focus of the Court's opinion was on the *exercise* of the right to vote *in an election*. The Court held that, once the local government authorized an election, it could not condition the right to vote *in that election* without a compelling justification. The Court did not come close to suggesting that, once a local government confers the right to vote on a matter, the local government cannot in the future decide that the matter should be decided by another means.

■ ■ Thus, in both *Kramer* and *Hussey*, the courts addressed impermissibly conditioning the right to vote *in an election*. In both cases, in other words, there was an election, and the government entities unlawfully imposed qualifications on who could vote *in that election*. That is not what happened in this case, in which the legislature has determined that a particular issue—the location of a school boundary—in a particular geographic area simply will not be decided by an election at all. As we have noted, the legislature possesses the constitutional right to determine local school boundaries with or without an election. *See, e.g., Linn Boundary Bd.*, 244 Or at 215 ("The Legislature has the constitutional power to create, abolish or alter school districts with or without a vote of the people within the area involved."). Simply because the legislature determines to grant the people the power to vote on the issue does not mean that the legislature cannot change its mind and exercise its constitutional authority to decide the matter for itself.

Closer to the point is the Sixth Circuit decision in *Mixon v. State of Ohio*, 193 F3d 389 (6th Cir 1999). At issue in that case was the constitutionality of an Ohio statute that altered the manner in which voters could select school board members. Before the legislation, school board members uniformly were selected by direct election. Under the challenged legislation, the school boards of five districts in the Cleveland

area were selected by the Mayor of Cleveland. The plaintiffs—voters in the five affected districts—argued that they had been denied the right to vote in violation of the Equal Protection Clause, because the state could offer no compelling justification for the difference in treatment between the five districts and all others. The court rejected their argument, explicitly drawing the very distinction that we have said is implicit in *Kramer* and *Hussey*:

> "Although Plaintiffs have a fundamental right to vote in elections before them, there is no fundamental right to elect an administrative body such as a school board, even if other cities in the state may do so."

*Id.* at 403.

The only issue in this case, therefore, is whether the legislature's decision to permit people in some geographic areas to vote on school district boundaries, but not in others, is consistent with the Fourteenth Amendment. Under the Fourteenth Amendment, differentiation on the basis of geographic location is subject to rational basis analysis only. *See, e.g., McGowan v. Maryland,* 366 US 420, 427, 81 S Ct 1101, 6 L Ed 2d 393 (1961) ("territorial uniformity is not a constitutional prerequisite"); *Reeder v. Kansas City Bd. Of Police Comm'rs,* 796 F2d 1050, 1053 (8th Cir 1986), *cert den* 479 US 1065 (1987) ("[T]he Supreme Court has long held that when the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated * * * so long as all persons within the jurisdictional reach of the statute are equally affected by the law * * *.").

As we already have held, there is no question that the distinctions drawn in Section 22 have a rational basis. We therefore conclude that the trial court did not err in holding that Section 22 does not violate the Equal Protection clause.

Affirmed.