Argued and submitted August 6, reversed and remanded to LUBA for
reconsideration of petitioners' constitutional arguments; otherwise affirmed
November 3, 2004, petition for review denied April 5, 2005 (338 Or 374)

## Phillip D. MORSMAN;
## Brigitte Morsman; and Doug Shepard,
### *Petitioners,*

*v.*

## CITY OF MADRAS,
### *Respondent.*

## 2003-170; A125106

100 P3d 761

Michael F. Sheehan argued the cause and filed the brief for petitioners.

Robert Lovlien argued the cause for respondent. With him on the brief was Bryant, Lovlien & Jarvis, P. C.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Petitioners seek review of a decision of the Land Use Board of Appeals (LUBA) that pertains to respondent City of Madras's annexation of 759 acres, primarily used for industrial purposes, thereby increasing the size of the city by about 50 percent. Before LUBA, petitioners raised several challenges, arguing, *inter alia*, that (1) the "triple majority" method of annexation that the city employed pursuant to ORS 222.170(1) is unconstitutional under Article I, section 20, of the Oregon Constitution; (2) even if that method is constitutional, the city did not properly implement the annexation pursuant to ORS 222.170(1); and (3) in all events, the annexation was not "reasonable" under the analysis prescribed in *Portland Gen. Elec. Co. v. City of Estacada*, 194 Or 145, 241 P2d 1129 (1952). After concluding that petitioners had waived their constitutional objections to the triple-majority method of annexation, LUBA either rejected or directed a limited remand with respect to petitioners' remaining assignments of error concerning the reasonableness of the annexation or the manner in which consents to annexation were obtained. As explained below, while we affirm LUBA's disposition of petitioners' other assignments of error, we conclude that LUBA erred in determining that petitioners had waived their constitutional challenge to the triple-majority method of annexation. Accordingly, we reverse and remand to LUBA for consideration of that matter.

This is the second time that this dispute has been before us. *See Morsman v. City of Madras*, 191 Or App 149, 81 P3d 711 (2003) (*Morsman II*), *affirming in part and reversing in part*, *Morsman v. City of Madras*, 45 Or LUBA 16 (2003) (*Morsman I*). In *Morsman II*, we described the annexation as follows:

> "[T]he annexation is of the 'cherry stem' variety, so called because the bulk of the annexed property (the 'cherry') is connected to the city by an annexed, narrow, 300-foot section of the Warm Springs Highway (the 'stem'). * * * Much of the annexed area is occupied by an already developed industrial park, the city's sewage treatment plant, its airport, and some residential properties, including petitioners'

[Morsmans'] 60-unit low income mobile home park. Some residential developments adjacent to the 'stem' portion of the Warm Springs Highway are not included in the annexed territory and remain outside of the city. The newly added area is within the city's urban growth boundary."

191 Or App at 151-52.

The city sought to annex the property through a process that does not require an election, generally referred to as the "triple majority" method of annexation. *See* ORS 222.170(1). Under that process,

"[t]he legislative body of the city need not call or hold an election in any contiguous territory proposed to be annexed if more than half of the owners of land in the territory, who also own more than half of the land in the contiguous territory and of real property therein representing more than half of the assessed value of all real property in the contiguous territory consent in writing to the annexation of their land in the territory and file a statement of their consent with the legislative body * * *."

*Id.* The city obtained consents from various property owners and, on February 25, 2003, enacted an ordinance annexing the property.

Petitioners Phillip and Brigitte Morsman, who owned land within the area to be annexed,[1] then filed the initial appeal to LUBA, challenging the city's enactment of the ordinance. The Morsmans raised three overarching arguments. First, they asserted that the city had failed to provide requisite notice and hearing pursuant to ORS 197.763, which governs notice and hearing requirements for quasi-judicial land use decisions. The city did not dispute that appropriate notice had not been given but argued, instead, that its failure in that regard did not require reversal because the Morsmans had, in fact, attended a public hearing pertaining to the annexation and had raised objections at that hearing. LUBA concluded that the lack of notice under ORS 197.763 required a remand:

---

[1] As described below, the city later altered the description of the territory to be annexed so that the Morsmans' property ultimately was not included within the annexed area. *See* 196 Or App at 72-73, and 73 n 2.

"[T]he city never provided any notice of applicable land use standards and did not consider any land use standards at [the public hearings] or in its annexation decision. As far as we can tell, the city simply failed to recognize that it must demonstrate that the disputed annexation is consistent with any criteria in its comprehensive plan that govern annexations or, if there are no such comprehensive plan annexation criteria, that the disputed annexation is consistent with statewide planning goals. Given that failure on the city's part, the city's decision must be remanded so that it may provide the required notice and hearing and adopt a decision that addresses the applicable land use standards."

*Morsman I*, 45 Or LUBA at 20.

Second, the Morsmans, invoking *City of Estacada*, raised a battery of challenges to the "reasonableness" of the cherry-stem annexation. LUBA rejected each of those arguments. *Morsman I*, 45 Or LUBA at 21-26.

Finally, the Morsmans argued that the city had offered improper inducements, both in the form of property tax advantages and land use preferences, to property owners who consented to annexation. The Morsmans contended that the city's alleged selective use of such *quid pro quo* arrangements was unconstitutional under the analysis of *Hussey v. City of Portland*, 64 F3d 1260 (9th Cir 1995), *cert den*, 516 US 1112 (1996). LUBA concluded that the record was insufficient to establish that the city had selectively and improperly offered property tax advantages. However, LUBA further determined that the Morsmans had presented credible evidence that the city had improperly offered land use regulation preferences as an inducement for securing some property owners' consents to annexation. Accordingly, LUBA remanded for the city either to explain why those arrangements were not improper or to "revise those agreements so they are consistent with *Hussey.*" *Morsman I*, 45 Or LUBA at 31. LUBA's decision in *Morsman I* was rendered on July 7, 2003.

The Morsmans then petitioned for judicial review in this court, arguing that LUBA had erred in rejecting their "reasonableness" arguments based on *City of Estacada*. In *Morsman II*, we held that, until the city had held the hearing required by LUBA's remand, "no definitive conclusion as to

reasonableness is possible." 191 Or App at 155. Accordingly, we reversed LUBA's decision to the extent that it had rejected the Morsmans' "reasonableness" arguments and, by extension, broadened the scope of LUBA's remand to the city. *Id.* ("LUBA's conclusion was, therefore, at least premature; before deciding whether the annexation is reasonable, LUBA must remand to the city for a determination as to whether the annexation meets statutory land use criteria."). Our decision in *Morsman II* was rendered on December 9, 2003.

Meanwhile—even before LUBA issued *Morsman I*, and long before we issued *Morsman II*—the city had not been inactive. Rather than awaiting the outcome of the Morsmans' challenges—and apparently in an effort to cure its noncompliance with ORS 197.763—the city held a series of public hearings on the annexation between June 24, 2003 (two weeks before *Morsman I* issued) and September 23, 2003. Several aspects of those proceedings are pertinent to our review and, particularly, to our reversal of LUBA's determination that petitioners waived their constitutional challenges to the "triple majority" method of annexation.

*First*, the city gave notice of the June 24, 2003, hearing pursuant to ORS 197.763, and both the Morsmans and petitioner Shepherd, who had not been a party to *Morsman I*, received the notice and appeared. *Second*, although neither the Morsmans nor Shepherd argued on June 24 that triple-majority annexation was unconstitutional, that hearing was continued, with the record being held open. *Third*, at a subsequent hearing on August 26, 2003, the Morsmans did, for the first time, raise the argument that ORS 222.170 is unconstitutional. Thereafter, at a continuation of that hearing, on September 23, 2003, petitioner Shepherd specifically endorsed and adopted all arguments raised by the Morsmans. At that same September 23 hearing, the city council received a staff report that addressed at length the question of whether the triple-majority annexation method violated Article I, section 20, of the Oregon Constitution, as well as the question of whether the inducements for the consents violated the Fourteenth Amendment to the United States Constitution. *Fourth*, also on September 23, the city council voted to alter the area to be annexed, excluding the

Morsmans' property; Shepherd's property continued to be included in the annexed area.[2]

On October 1, 2003, while *Morsman II* was still pending before this court, the city issued its decision approving the modified annexation. Petitioners timely appealed that decision to LUBA.

As noted above, our remand in *Morsman II* occurred in early December 2003. LUBA then remanded the matter to the city, which, on January 13, 2004, reopened the public hearing on the annexation matter.[3] The city attorney noted that, given the matters that had been determined in the city's October 1 decision and the scope of LUBA's remand following *Morsman II*, the hearing should address two issues: the "reasonableness" inquiry framed by *Morsman II* and the constitutionality of the inducements the city had offered to obtain consents to the annexation. The Morsmans and Shepherd appeared at the January 13 hearing. The city council continued that public hearing until January 27, 2004. At that time, the council voted to adopt various findings of fact and conclusions of law and approved the annexation ordinance. Petitioners timely sought LUBA review of that decision.

LUBA subsequently entered an order consolidating the appeal of the city's January 27, 2004, decision with the previously filed appeal from the October 1, 2003, decision. In the consolidated appeals, petitioners raised five assignments of error, arguing that (1) the triple-majority method of annexation is unconstitutional; (2) the city had failed to comply with procedures for adopting legislative revisions to the comprehensive plan before approving the annexation; (3) and (4) the city had improperly secured consents to annexation both through improper property tax inducements and

---

[2] The removal of the Morsmans' property from the area to be annexed might raise a question as to their standing to pursue judicial review in this court. However, because petitioner Shepherd continues to own property within the annexed area and, thus, clearly has standing, it is immaterial whether the Morsmans also have standing. *Just v. City of Lebanon*, 193 Or App 132, 135 n 2, 88 P3d 312, *rev allowed*, 337 Or 247 (2004).

[3] At its September 23, 2003, meeting, and before issuing its decision on October 1, 2003, the city council had voted to table the question of whether the annexation was reasonable, pending this court's decision in *Morsman II*.

improper assurances as to future land use regulation preferences; and (5) the annexation violated the "reasonableness" standards of *City of Estacada*.

In *Morsman v. City of Madras*, 47 Or LUBA 80 (2004) (*Morsman III*), LUBA declined to address the merits of petitioners' first assignment of error, pertaining to the constitutionality of ORS 222.170. The city had raised no procedural impediment to that assignment of error—indeed, as noted, the city had expressly addressed that matter on remand. *See* 196 Or App at 72-73. Nevertheless, LUBA *sua sponte* determined that, because the Morsmans had not raised that argument in *Morsman I*, they had waived it, regardless of their subsequent assertion of the constitutional challenge at the August 23, 2003, hearing and thereafter. LUBA concluded:

> "The key legislative policies that underlie LUBA review are that 'time is of the essence in reaching final decisions in matters involving land use and that those decisions [should] be made consistently with sound principles governing judicial review.' ORS 197.805. Overlooking petitioners' unexplained failure in *Morsman I* to raise any constitutional challenge to the triple-majority annexation procedure that the city employed to annex the disputed property and allowing constitutional challenges to the statute to be raised for the first time in this appeal of the city's decision following our remand in *Morsman I* is inconsistent with both of those legislative policies. *Mill Creek Glen Protection Assoc. v. Umatilla Co.*, 88 Or App 522, 526-27, 746 P2d 728 (1987). In *Beck v. Tillamook County*, 313 Or 148, 153 n 2, 831 P2d 678 (1992), the Oregon Supreme Court cited *Mill Creek Glen Protection Assoc.* with approval. In *Beck*, the court reviewed the relevant statutes governing LUBA review of land use decisions and judicial review of LUBA decisions and held that where LUBA remands a decision but rejects some of petitioner's assignments of error, those rejected assignments of error may not be reasserted in a subsequent LUBA appeal where petitioner does not appeal LUBA's remand decision and assign error to LUBA's rejection of those assignments of error. Similarly, petitioners may not fail to challenge the constitutionality of the triple-majority method of annexation in their first appeal, successfully argue that the annexation decision should be remanded based on other legal theories, and then

in this subsequent appeal following remand expand their legal theories to include a constitutional challenge to the triple-majority annexation procedure authorized by ORS 222.170(1). Deciding legal issues in such a 'piecemeal' manner is inconsistent with ORS 197.805. *Fisher v. City of Gresham*, 69 Or App 411, 414 n 1, 685 P2d 486 (1984)."

*Morsman III*, 47 Or LUBA at 87. LUBA offered no reason why that waiver analysis, even if correct, should also apply to petitioner Shepherd, who was not a party to *Morsman I*.

LUBA also rejected petitioners' second and fifth assignments of error. However, with respect to petitioners' third assignment of error, pertaining to improper offers of tax incentives as consideration for consents to annexation, LUBA concluded that the record established that the city had, in fact, offered selective property tax or sewage assessment advantages to secure consents from five property owners and that "[t]hat impropriety was not cured by the city's later decision, after the required number of consents had been obtained, to extend phased-in property-taxation to all property owners in the annexed area." 47 Or LUBA at 95. Accordingly, LUBA directed a limited remand with respect to the effect of those *quid pro quo* arrangements:

> "On remand, the city must first determine whether it retains the required triple majority without these five consents. If those consents are not needed for a triple majority, the error was harmless and the city may readopt the annexation without correcting the faulty consents. If any or all of these five consents are necessary for a triple majority, the city must have the property owners again consent to annexation[.]"

*Id.* Similarly with respect to the fourth assignment of error, pertaining to improper future assurances with respect to planning and zoning considerations, LUBA ordered the same sort of directed remand—*viz.*, if the consent of any or all of the affected property owners was necessary to secure the triple majority, "the city must have these property owners reexecute their agreements without the improper inducements or, alternatively, consent to annexation without any *quid pro quo* that is improper under *Hussey*." *Id.* at 97.

On judicial review, petitioners raise seven assignments of error that pertain, *inter alia*, to LUBA's waiver analysis, the constitutionality of ORS 222.170(1), the proper interplay between the city's *quid pro quo* arrangements and the scope of LUBA's remand as to those arrangements, the city's reconfiguration of the area to be annexed, and the "reasonableness" of the annexation. We write only to address petitioners' first assignment of error, which challenges LUBA's waiver determination, and petitioners' sixth assignment of error, in which they assert that the consents obtained by the city were invalid because they were obtained before the city reconfigured the area to be annexed. We reject without discussion petitioners' remaining assignments of error.

■ We begin with waiver. As noted, the gravamen of LUBA's waiver analysis was that, under the "raise it or waive it" principles applied in *Beck*, the Morsmans were obligated to have raised their constitutional challenge to the triple-majority method of annexation in *Morsman I*. We reject that holding for either of two reasons.

First, LUBA's analysis does not account for Shepherd, who was not a party to *Morsman I*. Nor can Shepherd's failure to participate in *Morsman I* be itself deemed a waiver, because—as LUBA explicitly acknowledged in *Morsman I*—the city had failed to comply with the notice requirements of ORS 197.763(1). *See Morsman I*, 45 Or LUBA at 20. ORS 197.763(1) provides:

> "An issue which may be the basis for an appeal to the Land Use Board of Appeals shall be raised not later than the close of the record at or following the final evidentiary hearing on the proposal before the local government. Such issues shall be raised and accompanied by statements or evidence sufficient to afford the governing body, planning commission, hearings body or hearings officer, and the parties an adequate opportunity to respond to each issue."

Here, Shepherd was never given the statutorily prescribed notice until long after the city rendered the decision that was the object of *Morsman I*. Further, once the city did give the statutorily prescribed notice, Shepherd did participate, and he did (by adopting the Morsmans' arguments) raise the constitutional issue before "the close of the record at or following

the final evidentiary hearing on the proposal before the local government." ORS 197.763(1). *See* 196 Or App at 72 (recounting Shepherd's adoption of Morsmans' arguments at September 23, 2003, hearing).

Second, and for related reasons, the Morsmans themselves cannot be deemed to have waived their constitutional challenge by failing to raise that argument in *Morsman I*. Because there was no "final evidentiary hearing on the proposal" in compliance with ORS 197.763(1) before the *Morsman I* appeal, in that the city had failed to give notice of the hearing in accordance with that statute, the statutory "raise it or waive it" bar had not yet been triggered.

We note, moreover, that *Beck* does not support LUBA's conclusion that the Morsmans had waived their constitutional challenge to ORS 222.170(1). In *Beck*, the Supreme Court addressed the following question: "When petitioners appealed a local land use decision to LUBA and prevailed only in part, obtaining a remand, did the applicable statutes require them to seek judicial review of the legal issues that LUBA decided against them at that time, or could they wait until after the remand and a second appeal to LUBA to do so?" 313 Or at 150. The court decided the issue as a matter of statutory construction. It looked to the relevant provisions of ORS chapter 197, noted that ORS 197.763(7) defines the scope of remand, and concluded:

> "In other words, when the record is reopened, parties may raise new, unresolved issues that relate to new evidence. The logical corollary is that parties may not raise old, resolved issues again. When the record is reopened at LUBA's direction on remand, the 'new issues' by definition include the remanded issues, but not the issues that LUBA affirmed or reversed on their merits, which are old, resolved issues.

---

[2] Although the parties do not discuss it, we note that the list of persons who brought the first appeal to LUBA is not identical to the list of persons who brought the second appeal to LUBA. That difference is not significant in this instance, because the additional parties had the opportunity to participate in the first appeal but did not. (They

were nearby landowners who received notice of the first proceeding.) We agree with the reasoning of the Court of Appeals in *Mill Creek Glen Protection Assoc. v. Umatilla Co.*, 88 Or App 522, 527, 746 P2d 728 (1987), when it analyzed the LUBA statutes in an analogous situation: 'A party who did not raise an issue in an earlier proceeding because he chose not to participate in it should be as precluded from later raising the issue as a party who did participate but neglected to raise the issue.' "

*Beck*, 313 Or at 153.

This case differs materially from *Beck* in several respects. First, all of the parties in *Beck* received legally adequate notice of the initial hearing—even those who did not participate in the first LUBA appeal. Here, by contrast, *none* of the petitioners received legally adequate notice of the first hearing before the first LUBA appeal.[4]

Moreover, *Beck* concerned an issue that had been raised and resolved in the previous LUBA appeal and, thus, was not within the scope of LUBA's remand. Here, by contrast, the constitutional issue had not been raised, much less resolved, in *Morsman I*. Further, as noted in the procedural history set out above, the city gave notice pursuant to ORS 197.763 and commenced the new public hearing on the annexation on June 24, 2003, *before* LUBA *or* this court had even remanded the case.[5] Under those circumstances, it would be paradoxical to hold that the matters properly cognizable in those new proceedings were somehow controlled by the scope of a LUBA remand that had not yet occurred— much less by the scope of our remand in *Morsman II*, which

---

[4] Even if we were to extend *Beck* to say that the Morsmans were barred from raising an issue because they appeared at the first hearing despite lack of adequate notice, the same would not apply to Shepherd. He is an affected landowner who did not receive notice of the hearing at issue in *Morsman I* and did not appear at that hearing. This is not a situation comparable to Beck, in that there is no basis for saying that Shepherd "chose not to participate" when he failed to appear at a hearing for which he received no notice.

[5] It is debatable whether it was procedurally proper for the city to resume hearings under those circumstances, given the pendency of the LUBA appeal and the later judicial review in this court. However, no party takes issue with the city's decision to resume the hearings, and we do not perceive any procedural irregularity in this regard to implicate a jurisdictional matter that we would be obliged to address *sua sponte*.

did not occur until two months after the city had issued its final order on the constitutional issue on October 1, 2003.

We thus conclude that LUBA erred in determining that petitioners had waived their argument that the triple-majority method of annexation is unconstitutional. We remand for LUBA to consider that matter in the first instance.

■   In their sixth assignment of error, petitioners argue that the consents obtained by the city in support of annexation are invalid because they were obtained before the city reconfigured the area to be annexed. In particular, petitioners contend that the annexation ordinance that the city ultimately passed was invalid because it "is not the annexation consented to." We disagree.

ORS 222.170 provides, in part:

"(1)   The legislative body of the city need not call or hold an election in any contiguous territory proposed to be annexed if more than half of the owners of land in the territory, who also own more than half of the land in the contiguous territory and of real property therein representing more than half of the assessed value of all real property in the contiguous territory consent in writing to the annexation of their land in the territory and file a statement of their consent with the legislative body on or before the day:

"(a)   The public hearing is held under ORS 222.120, if the city legislative body dispenses with submitting the question to the electors of the city[.]

"* * * * *

"(3)   If * * * the city legislative body has previously dispensed with submitting the question to the electors of the city as provided in ORS 222.120, the legislative body, by resolution or ordinance, shall set the final boundaries of the area to be annexed by a legal description and proclaim the annexation."

We conclude, for either of two reasons, that ORS 222.170 does not require consents to be reexecuted if a city alters the description of the areas to be annexed before it finally "proclaim[s] the annexation." ORS 222.170(3). First, landowners do not consent to the annexation as a whole;

rather, they "consent in writing to the annexation of *their* land[.]" ORS 222.170(1) (emphasis added). Nothing in the statute or, for that matter, in the written consents in this case, signifies that landowners, in executing consents, condition their consent on the annexation of any property other than their own. Consequently, reconfiguration of the area to be annexed does not alter the validity of previously obtained consents.

Second, ORS 222.170(3) states that, when the local legislative body has complied with the procedures for annexing land via the triple-majority method, the legislative body "by resolution or ordinance, shall set the *final* boundaries of the area to be annexed by a legal description and proclaim the annexation." (Emphasis added.) Under that statute, the final boundaries of the area to be annexed are established when the legislative body "proclaim[s] the annexation" by resolution or, as in this case, by passage of an ordinance.[6] We thus conclude that ORS 222.170 does not require a governing body to seek renewed consents to annexation when it alters its annexation plan before its ultimate passage of a resolution or ordinance annexing land.[7]

Reversed and remanded to LUBA for reconsideration of petitioners' constitutional arguments; otherwise affirmed.

---

[6] In *Skourtes v. City of Tigard*, 250 Or 537, 540, 444 P2d 22 (1968), which neither party cites, the court interpreted the then-extant triple-majority annexation provisions of ORS 222.170 and concluded that, although that statute did "not explicitly require the submission of an annexation plan to the landowners in the contiguous area before obtaining their consent, we think that the requirement can be found in the statute by implication." The court in that case, however, was interpreting an earlier version of the statute that did not specify whether the landowner's consent related only to the landowner's own land and did not indicate when the legislative body was to establish the final boundaries of the annexation. The legislature responded by amending the statute to make the consents relate only to the landowners' own land and to indicate that the final boundaries of the annexation were to be established upon the passage of the resolution or ordinance. Or Laws 1971, ch 673, § 1. *See also Johnson v. City of La Grande*, 167 Or App 35, 44, 1 P3d 1036 (2000) (noting statutory changes supercede holding in *Skourtes*).

[7] Of course, new consents may be necessary from landowners whose property is *added* to the annexed area. *See generally Peterson v. Portland Met. Bdry. Com.*, 21 Or App 420, 535 P2d 577 (1975). Conversely, at least in the abstract, the deletion of the property of a previously consenting landowner might also alter the triple-majority calculus.