Argued and submitted October 10, 2005, affirmed January 4, petition for review denied April 25, 2006 (340 Or 483)

# Phillip D. MORSMAN,
## Brigitte Morsman and Doug Shepard,
### *Petitioners,*

*v.*

## CITY OF MADRAS,
### *Respondent.*

### 2003-170; A129627

126 P3d 6

Michael F. Sheehan argued the cause and filed the brief for petitioners.

Robert Lovlien argued the cause for respondent. With him on the brief was Bryant, Lovlien & Jarvis, P.C.

Before Armstrong, Presiding Judge, and Brewer, Chief Judge, and Haselton, Judge.*

BREWER, C. J.

---

\* Haselton, J., *vice* Richardson, S. J.

## BREWER, C. J.

Petitioners seek review of a decision of the Land Use Board of Appeals (LUBA) that pertains to respondent City of Madras's annexation of 759 acres of land. Before LUBA, petitioners argued that the "triple majority" method of annexation that the city employed pursuant to ORS 222.170(1) is unconstitutional under Article I, section 20, of the Oregon Constitution,[1] and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. LUBA rejected petitioners' constitutional challenges to the statute, and we affirm.

This is the third time that this dispute has been before us. See *Morsman v. City of Madras*, 196 Or App 67, 100 P3d 761 (2004), *rev den*, 338 Or 374 (2005) (*Morsman IV*), reversing and remanding *Morsman v. City of Madras*, 47 Or LUBA 80 (2004) (*Morsman III*); *Morsman v. City of Madras*, 191 Or App 149, 81 P3d 711 (2003) (*Morsman II*), affirming in part and reversing in part, *Morsman v. City of Madras*, 45 Or LUBA 16 (2003) (*Morsman I* ). We take much of the procedural history of this case from our summary in *Morsman IV*:

> "In *Morsman II*, we described the annexation as follows:
>
> " '[T]he annexation is of the "cherry stem" variety, so called because the bulk of the annexed property (the "cherry") is connected to the city by an annexed, narrow, 300-foot section of the Warm Springs Highway (the "stem"). * * * Much of the annexed area is occupied by an already developed industrial park, the city's sewage treatment plant, its airport, and some residential properties, including petitioners' [Morsmans'] 60-unit low income mobile home park. Some residential developments adjacent to the "stem" portion of the Warm Springs Highway are not included in the annexed territory and remain outside of the city. The newly added area is within the city's urban growth boundary.'
>
> "191 Or App at 151-52.

---

[1] Article I, section 20, of the Oregon Constitution provides that "[n]o law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

"The city sought to annex the property through a process that does not require an election, generally referred to as the 'triple majority' method of annexation. *See* ORS 222.170(1). Under that process,

" '[t]he legislative body of the city need not call or hold an election in any contiguous territory proposed to be annexed if more than half of the owners of land in the territory, who also own more than half of the land in the contiguous territory and of real property therein representing more than half of the assessed value of all real property in the contiguous territory consent in writing to the annexation of their land in the territory and file a statement of their consent with the legislative body * * *.'

"*Id.* The city obtained consents from various property owners and, on February 25, 2003, enacted an ordinance annexing the property.

"Petitioners Phillip and Brigitte Morsman, who owned land within the area to be annexed, * * * then filed the initial appeal to LUBA, challenging the city's enactment of the ordinance. The Morsmans raised three overarching arguments. First, they asserted that the city had failed to provide requisite notice and hearing pursuant to ORS 197.763, which governs notice and hearing requirements for quasi-judicial land use decisions. The city did not dispute that appropriate notice had not been given but argued, instead, that its failure in that regard did not require reversal because the Morsmans had, in fact, attended a public hearing pertaining to the annexation and had raised objections at that hearing. LUBA concluded that the lack of notice under ORS 197.763 required a remand[.]

"* * * * *

"*Morsman I*, 45 Or LUBA at 20.

"Second, the Morsmans, invoking [*Portland Gen. Elec. Co. v.*] *City of Estacada*, [194 Or 145, 241 P2d 1129 (1952)], raised a battery of challenges to the 'reasonableness' of the cherry-stem annexation. LUBA rejected each of those arguments. *Morsman I*, 45 Or LUBA at 21-26.

"Finally, the Morsmans argued that the city had offered improper inducements, both in the form of property tax advantages and land use preferences, to property owners who consented to annexation. The Morsmans contended

that the city's alleged selective use of such *quid pro quo* arrangements was unconstitutional under the analysis of *Hussey v. City of Portland*, 64 F3d 1260 (9th Cir 1995), *cert den*, 516 US 1112 (1996). LUBA concluded that the record was insufficient to establish that the city had selectively and improperly offered property tax advantages. However, LUBA further determined that the Morsmans had presented credible evidence that the city had improperly offered land use regulation preferences as an inducement for securing some property owners' consents to annexation. Accordingly, LUBA remanded for the city either to explain why those arrangements were not improper or to 'revise those agreements so they are consistent with *Hussey*.' *Morsman I*, 45 Or LUBA at 31. LUBA's decision in *Morsman I* was rendered on July 7, 2003.

"The Morsmans then petitioned for judicial review in this court, arguing that LUBA had erred in rejecting their 'reasonableness' arguments based on *City of Estacada*. In *Morsman II*, we held that, until the city had held the hearing required by LUBA's remand, 'no definitive conclusion as to reasonableness is possible.' 191 Or App at 155. Accordingly, we reversed LUBA's decision to the extent that it had rejected the Morsmans' 'reasonableness' arguments and, by extension, broadened the scope of LUBA's remand to the city. *Id.* ('LUBA's conclusion was, therefore, at least premature; before deciding whether the annexation is reasonable, LUBA must remand to the city for a determination as to whether the annexation meets statutory land use criteria.'). Our decision in *Morsman II* was rendered on December 9, 2003.

"Meanwhile—even before LUBA issued *Morsman I*, and long before we issued *Morsman II*—the city had not been inactive. Rather than awaiting the outcome of the Morsmans' challenges—and apparently in an effort to cure its noncompliance with ORS 197.763—the city held a series of public hearings on the annexation between June 24, 2003 (two weeks before *Morsman I* issued) and September 23, 2003. Several aspects of those proceedings are pertinent to our review and, particularly, to our reversal of LUBA's determination that petitioners waived their constitutional challenges to the 'triple majority' method of annexation.

"*First*, the city gave notice of the June 24, 2003, hearing pursuant to ORS 197.763, and both the Morsmans and petitioner Shepherd, who had not been a party to *Morsman I*,

received the notice and appeared. *Second*, although neither the Morsmans nor Shepherd argued on June 24 that triple-majority annexation was unconstitutional, that hearing was continued, with the record being held open. *Third*, at a subsequent hearing on August 26, 2003, the Morsmans did, for the first time, raise the argument that ORS 222.170 is unconstitutional. Thereafter, at a continuation of that hearing, on September 23, 2003, petitioner Shepherd specifically endorsed and adopted all arguments raised by the Morsmans. At that same September 23 hearing, the city council received a staff report that addressed at length the question of whether the triple-majority annexation method violated Article I, section 20, of the Oregon Constitution, as well as the question of whether the inducements for the consents violated the Fourteenth Amendment to the United States Constitution. *Fourth*, also on September 23, the city council voted to alter the area to be annexed, excluding the Morsmans' property; Shepherd's property continued to be included in the annexed area.

"On October 1, 2003, while *Morsman II* was still pending before this court, the city issued its decision approving the modified annexation. Petitioners timely appealed that decision to LUBA.

"As noted above, our remand in *Morsman II* occurred in early December 2003. LUBA then remanded the matter to the city, which, on January 13, 2004, reopened the public hearing on the annexation matter. The city attorney noted that, given the matters that had been determined in the city's October 1 decision and the scope of LUBA's remand following *Morsman II*, the hearing should address two issues: the 'reasonableness' inquiry framed by *Morsman II* and the constitutionality of the inducements the city had offered to obtain consents to the annexation. The Morsmans and Shepherd appeared at the January 13 hearing. The city council continued that public hearing until January 27, 2004. At that time, the council voted to adopt various findings of fact and conclusions of law and approved the annexation ordinance. Petitioners timely sought LUBA review of that decision.

"LUBA subsequently entered an order consolidating the appeal of the city's January 27, 2004, decision with the previously filed appeal from the October 1, 2003, decision. In the consolidated appeals, petitioners raised five assignments of error, arguing that (1) the triple-majority method

of annexation is unconstitutional; (2) the city had failed to comply with procedures for adopting legislative revisions to the comprehensive plan before approving the annexation; (3) and (4) the city had improperly secured consents to annexation both through improper property tax inducements and improper assurances as to future land use regulation preferences; and (5) the annexation violated the 'reasonableness' standards of *City of Estacada*.

"In *Morsman v. City of Madras*, 47 Or LUBA 80 (2004) (*Morsman III* ), LUBA declined to address the merits of petitioners' first assignment of error, pertaining to the constitutionality of ORS 222.170. The city had raised no procedural impediment to that assignment of error—indeed, as noted, the city had expressly addressed that matter on remand. *See* 196 Or App at 72. Nevertheless, LUBA *sua sponte* determined that, because the Morsmans had not raised that argument in *Morsman I*, they had waived it, regardless of their subsequent assertion of the constitutional challenge at the August 23, 2003, hearing and thereafter."

196 Or App at 69-74 (emphasis in original; footnotes omitted).

LUBA rejected petitioners' remaining assignments of error in *Morsman III* on their merits. In *Morsman IV*, we upheld LUBA's rejection of each of petitioners' assignments of error in *Morsman III* except one; we concluded that LUBA had erred in determining that petitioners had waived their constitutional challenges to the triple majority method of annexation, and we remanded for LUBA to consider those challenges in the first instance. *Id.* at 79. In *Morsman v. City of Madras (Morsman V)*, 50 Or LUBA 1 (2005), LUBA addressed and rejected both of petitioners' constitutional arguments on their merits.

Petitioners once again seek review before this court. On review, petitioners reprise their arguments before LUBA that the triple majority statutory scheme is unconstitutional under both the Oregon and United States constitutions because it dispenses, in certain circumstances, with a vote of the electorate on a proposed municipal annexation. We review LUBA's determination for errors of law. ORS 197.850(9)(b); *Corp. of Presiding Bishop v. City of West Linn*,

192 Or App 567, 577, 86 P3d 1040 (2004), *aff'd*, 338 Or 453, 111 P3d 1123 (2005).

■■ To place petitioners' arguments in context, we first set out pertinent portions of the statutory scheme that they challenge. ORS 222.111(5) provides:

"The legislative body of the city shall submit, except when not required under ORS 222.120, 222.170 and 222.840 to 222.915 to do so, the proposal for annexation to the electors of the territory proposed for annexation and, except when permitted under ORS 222.120 or 222.840 to 222.915 to dispense with submitting the proposal for annexation to the electors of the city, the legislative body of the city shall submit such proposal to the electors of the city. The proposal for annexation may be voted upon at a general election or at a special election to be held for that purpose."

ORS 222.170 sets out two of the methods of annexation that are permitted without submitting the proposal to the electors of the territory proposed for annexation.[2] The use of the first

---

[2] ORS 222.120 provides another exemption from the requirement that the proposal for annexation be submitted to the electors of the territory proposed for annexation. That statute provides, in part:

"(1) Except when expressly required to do so by the city charter, the legislative body of a city is not required to submit a proposal for annexation of territory to the electors of the city for their approval or rejection.

"(2) When the legislative body of the city elects to dispense with submitting the question of the proposed annexation to the electors of the city, the legislative body of the city shall fix a day for a public hearing before the legislative body at which time the electors of the city may appear and be heard on the question of annexation.

"(3) The city legislative body shall cause notice of the hearing to be published once each week for two successive weeks prior to the day of hearing, in a newspaper of general circulation in the city, and shall cause notices of the hearing to be posted in four public places in the city for a like period.

"(4) After the hearing, the city legislative body may, by an ordinance containing a legal description of the territory in question:

"(a) Declare that the territory is annexed to the city upon the condition that the majority of the votes cast in the territory is in favor of annexation;

"(b) Declare that the territory is annexed to the city where electors or landowners in the contiguous territory consented in writing to such annexation, as provided in ORS 222.125 or 222.170, prior to the public hearing held under subsection (2) of this section; or

"(c) Declare that the territory is annexed to the city where the Department of Human Services, prior to the public hearing held under subsection (1)

method in ORS 222.170—the one at issue here—depends on the consent of more than half of the owners of land in the territory proposed to be annexed, subject to two additional majority requirements.[3] ORS 222.170(1) provides:

> "The legislative body of the city need not call or hold an election in any contiguous territory proposed to be annexed if more than half of the owners of land in the territory, who also own more than half of the land in the contiguous territory and of real property therein representing more than half of the assessed value of all real property in the contiguous territory consent in writing to the annexation of their land in the territory and file a statement of their consent with the legislative body on or before the day:

> "(a)   The public hearing is held under ORS 222.120, if the city legislative body dispenses with submitting the question to the electors of the city; or

> "(b)   The city legislative body orders the annexation election in the city under ORS 222.111, if the city legislative body submits the question to the electors of the city."

With that framework in mind, we first consider petitioners' challenge under Article I, section 20, which, among

---

of this section, has issued a finding that a danger to public health exists because of conditions within the territory as provided by ORS 222.840 to 222.915.

"\* \* \* \* \*

"(6)  The ordinance referred to in subsection (4) of this section is subject to referendum."

ORS 222.840 to 222.915 set out the process for annexations to remove dangers to public health by providing sanitary, water, or other facilities. Although subject to judicial review, such annexation decisions are made upon hearing by the Director of the Department of Human Services. ORS 222.880.

[3] The second method requires the consent of a combination of electors and property owners. ORS 222.170(2) provides:

"The legislative body of the city need not call or hold an election in any contiguous territory proposed to be annexed if a majority of the electors registered in the territory proposed to be annexed consent in writing to annexation and the owners of more than half of the land in that territory consent in writing to the annexation of their land and those owners and electors file a statement of their consent with the legislative body on or before the day:

"(a)  The public hearing is held under ORS 222.120, if the city legislative body dispenses with submitting the question to the electors of the city; or

"(b)  The city legislative body orders the annexation election in the city under ORS 222.111, if the city legislative body submits the question to the electors of the city."

other protections, shields "true classes" of persons against disparate treatment in laws that grant privileges or immunities. *See Tanner v. OHSU,* 157 Or App 502, 520-21, 971 P2d 435 (1998). Petitioners' challenge rests, in part, on the premise that ORS 222.111(5) confers upon the electors of a territory proposed for annexation a generalized right to vote on annexation decisions. As petitioners understand it, ORS 222.111(5) *requires* the legislative body of a city to submit a proposal for annexation to the electors of the territory proposed for annexation, and then, in conjunction with ORS 222.170(1), selectively withdraws that right from some electors.[4] For the reasons that follow, we conclude that, even if petitioners' understanding of ORS 222.111(5) were correct, the triple majority annexation scheme would not violate Article I, section 20.

■        In *Tanner,* we explained:

"As used in the Article I, section 20, case law, the term 'class' takes on special meaning; only laws that disparately treat a 'true class' may violate that section of the constitution. *State ex rel Huddleston v. Sawyer,* 324 Or 597, 610, 932 P2d 1145, *cert den*[, 522] US [994], 118 S Ct 557, 139 L Ed 2d 399 (1997). In attempting to describe precisely what is meant by a 'true class,' the cases draw a distinction between classes that are created by the challenged law or government action itself and classes that are defined in terms of characteristics that are shared apart from the challenged law or action.

"The standard example of a nontrue class, drawn from the Supreme Court's decision in [*State v.*] *Clark*[, 291 Or 231, 237, 630 P2d 810 (1981)],[5] is the classification created by a statute that imposes a filing deadline for filing a petition for review. Such legislation creates two classes of persons: (1) those who timely file petitions for review, and (2) those who do not. Both are 'classes' of persons, at least in the colloquial sense of groups having something in common.

---

[4] Because the construction of ORS 222.111(5) would not fully resolve petitioners' challenge under Article I, section 20, we defer that issue for elaboration in our analysis of petitioners' equal protection challenge under the United States Constitution.

[5] In *Clark,* the Supreme Court held that Article I, section 20, "forbids inequality of privileges or immunities not available upon the same terms, first, to any citizen, and second, to any class of citizens." 291 Or at 237.

But in the absence of the statute, they have no identity at all. Legislation that disparately affects such 'classes' does not violate Article I, section 20, because of the essentially circular nature of the argument: The legislation cannot disparately affect a class that the legislation itself creates. *Clark*, 291 Or at 240. *See also Sealey v. Hicks*, 309 Or 387, 397, 788 P2d 435 (1990); *Hale v. Port of Portland*, 308 Or 508, 525, 783 P2d 506 (1989).

"In contrast, Article I, section 20, does protect against disparate treatment of true classes, those that have identity apart from the challenged law itself. Various formulations have been used to describe in some affirmative way what a true class *is*, as opposed to merely what it is *not* in reference to classes created by the challenged legislation. The cases refer to classification by '*ad hominem* characteristic,' *Van Wormer v. City of Salem*, 309 Or 404, 408, 788 P2d 443 (1990), by 'personal characteristic,' *Zockert v. Fanning*, 310 Or 514, 523, 800 P2d 773 (1990), and by 'antecedent personal or social characteristics or societal status,' *Hale*, 308 Or at 525. Examples of true classes include gender, ethnic background, legitimacy, past or present residency, and military service. *Clark*, 291 Or at 240.

"To say that disparately treated true classes are protected by Article I, section 20, does not end the matter. Depending on what type of true class is involved, the legislation or governmental action may or may not be upheld in spite of the disparity. In that regard, the cases draw a distinction between 'suspect' classes and other true classes. The former classes are subject to a more demanding level of scrutiny, and legislation or government action disparately treating such classes is much more likely to run afoul of Article I, section 20, than is legislation or government action that disparately treats a nonsuspect class."

157 Or App at 520-21.

Petitioners assert that the statutory scheme unlawfully discriminates against a "true class" of persons under Article I, section 20, namely, resident electors who do not own property in the territory proposed for annexation, by denying them the right to vote on the annexation.[6] According to petitioners, such persons constitute a "true class" under Article I,

---

[6] At first blush, it might appear that petitioners' challenge is not justiciable, because, as property owners, they are not members of the class—resident nonproperty owning electors—whose constitutional rights they assert have been abridged

section 20, because their existence as a class does not arise from ORS 222.170(1) itself. Petitioners also argue that the class is suspect because its members historically have been subjected to discriminatory treatment. According to petitioners, since ancient times, political power "has been distributed on the basis of the ownership of real property."

Assuming without deciding that resident electors who do not own property in a territory proposed for annexation constitute a true class under Article I, section 20, *cf. Sherwood School Dist. 88J v. Washington Cty. Ed.*, 167 Or App 372, 386-87, 6 P3d 518 (2000) (holding that voters subject to disparate treatment on the basis of geographical residence constituted a true class), they are not a suspect class. Although our cases have not produced a precise definition of what constitutes a suspect class, the focus is on characteristics that are historically regarded as defining distinct, socially recognized groups that have been the subject of adverse social or political stereotyping or prejudice. *Gunn v. Lane County*, 173 Or App 97, 103, 20 P3d 247 (2001); *Tanner*, 157 Or App at 522-23. Although, even in modern times, there exist laws that favor property owners over those who do not own property, petitioners have adduced no authority for the proposition that persons in the latter group are the subject of the sort of adverse social or political stereotyping or prejudice that characterizes a suspect class. Accordingly, we conclude that, even if such persons constitute a true class, they are not a suspect class.

Because petitioners are not members of a suspect class, the next question is whether the distinctions drawn by the law here have a rational basis. *Cox v. State of Oregon*, 191 Or App 1, 4, 80 P3d 514 (2003). We begin with a brief review

by the triple majority scheme. *See Strunk v. PERB*, 338 Or 145, 153, 108 P3d 1058 (2005) (for party to have constitutional standing, court's decision must have a practical effect on party's rights). However, the framing of the justiciability inquiry is all important. As discussed, petitioners' overarching argument is that all electors within the territory proposed for annexation, including petitioners themselves, were unconstitutionally deprived of their right to vote on the annexation decision. Should their challenge prevail, petitioners, together with other electors, including nonproperty owners residing in the territory proposed for annexation, would secure that right. The loss of that right amounts to a constitutionally sufficient practical effect. Accordingly, we adhere to our implicit conclusion in *Morsman IV* that, as owners of property in the territory proposed to be annexed, petitioners have constitutional standing to challenge the triple majority scheme.

of our jurisprudence on that issue in the context of other triple majority legislation. In *Mid-County Future Alt. v. Port. Metro. Area LGBC*, 82 Or App 193, 199-201, 728 P2d 63 (1986), *rev dismissed*, 304 Or 89 (1987), we examined the constitutionality of a triple majority method of annexation authorized by ORS 199.490(2),[7] in the context of the annexation of 450 acres to the City of Portland. That section permits a governing body to initiate an annexation by resolution after receiving the consent of a triple majority of the landowners in the territory proposed to be annexed. The justification posited for that statutory scheme was the local government's interest in eliminating the administrative burden of an election where consent procedures already had established that the proposed annexation was favored by the property owners of the territory. *Id.* at 199-200. To determine whether a permissible basis for the disparate treatment existed, we balanced the governmental interest in the triple majority scheme against the interests of excluded electors. *Id.* We held that the governmental interest was not sufficient when weighed against the privilege to vote in a matter of general concern to the electors in the territory, including those who did not own property and, therefore, concluded that the statutory scheme violated Article I, section 20. *Id.*

However, we later renounced the balancing test employed in *Mid-County Future Alt.* In *Sherwood*, we considered a challenge under Article I, section 20, to a statute that changed a school district's boundary on the ground that the statute denied a local vote on the boundary change. In upholding the statute, we relied on *Hale v. Port of Portland*, 308 Or 508, 524, 783 P2d 506 (1989), in which the Supreme Court rejected a challenge to a statute under Article I, section 20, that was based on a balancing test such as the one that we applied in *Mid-County Future Alt. Sherwood,* 167 Or App at 389-90. Instead, the court in *Hale* applied a rational basis test for evaluating the constitutionality of disparate treatment not involving a suspect class. Following *Hale*, in *Sherwood*, we stated that "[o]rdinarily, disparate treatment of classes will be upheld if there is a rational basis for the

---

[7] ORS 199.490 provides for annexations to effectuate minor boundary changes or territory transfers in municipalities and districts.

disparity, but if the disparity is a result of a 'suspect' classification, the disparity is subject to a more demanding examination." *Sherwood*, 167 Or App at 385-86. Under the less demanding rational basis standard, a statute must be upheld as long as it is tied to a legitimate governmental purpose, regardless of whether that purpose is set out in the statute or legislative history, or was even considered by the legislature. *Kane v. City of Beaverton*, 202 Or App 431, 438, 122 P3d 137 (2005). The burden, therefore, falls "on the one attacking the legislative arrangement to negative every conceivable basis which might support it, * * * whether or not the basis has a foundation in the record." *Id.* at 439 (internal quotation marks omitted).

We conclude that the triple majority scheme challenged in this case passes muster under the rational basis standard. As noted in *Mid-County Future Alt.*, the triple majority annexation method eliminates the administrative burden of an election where consent procedures already have established that a proposed annexation is favored by the property owners of the territory. 82 Or App at 199. That purpose serves a legitimate legislative end. *See Vail v. City of Bandon*, 53 Or App 133, 137, 630 P2d 1339, *rev den*, 291 Or 771 (1981) (describing rational basis test as a "minimum rationality" standard). We therefore reject petitioners' challenge to the statute under Article I, section 20. *See Sherwood*, 167 Or App at 388 (upholding, under rational basis test, statute eliminating right to vote on change in school district boundaries, against Article I, section 20, challenge).

■ We turn to petitioners' challenge under the Equal Protection Clause of the Fourteenth Amendment. Petitioners rely in large part on *Kramer v. Union Free School District No. 15*, 395 US 621, 89 S Ct 1886, 23 L Ed 2d 583 (1969). In that case, the Supreme Court addressed the constitutionality of a New York statutory scheme that allowed certain school districts to limit voter eligibility in school board elections to persons residing in the district who owned property or had children enrolled as students in the district. In certain other districts, all qualified voters were permitted to vote for board positions, and, in others, board members were appointed.

The Court held that, if a right to participate in an election is legislatively established, a legislative determination of voter eligibility in the election is subject to strict scrutiny. In so concluding, the Court distinguished between a legislative choice whether to authorize elections and a legislative determination of electoral qualifications. *See Sherwood,* 167 Or App at 391 (so characterizing *Kramer*). That distinction may be further elaborated as follows: Unless a fundamental right to vote on the subject matter exists, an equal protection challenge to legislation providing for governmental decision-making by a nonelectoral process generally is reviewed under the rational basis standard. *Kramer,* 395 US at 627-29. However, even if no fundamental right to vote is implicated, laws that deny *some* residents the right to vote in nonspecial interest elections on grounds other than residence, age, or citizenship may violate the Equal Protection Clause. *Hill v. Stone,* 421 US 289, 297, 95 S Ct 1637, 44 L Ed 2d 172 (1975); *Hayward v. Clay,* 573 F2d 187, 190 (4th Cir 1978).

There is no fundamental federal constitutional right to vote on municipal annexation decisions. In that regard, this court recently upheld an "island" territory annexation procedure that did not provide for an electoral vote against a challenge under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We reasoned:

> "Other courts that have considered whether there exists a 'fundamental right' to vote in municipal annexations have similarly rejected that notion. *See, e.g., Barefoot v. City of Wilmington,* 306 F3d 113, 121-23 (4th Cir 2002) (citizens do not have a fundamental right to vote on annexation); *Moorman v. Wood,* 504 F Supp 467, 474 (1980) (ED Ky) ('granting the franchise [for annexation elections] to residents of one area, and denying it to those of another area * * *' does not deny a fundamental right); *Givorns v. City of Valley,* 598 So2d 1338, 1341 (Ala 1992) (statute imposing geographic restrictions on right to vote in annexation elections does not infringe upon a fundamental right); *Beck v. City of San Mateo,* 154 Cal App 3d 374, 201 Cal Rptr 365 (1984) (statute denying voting rights to 'island' territories substantially surrounded by annexing community did not infringe upon a fundamental right); *Grant County Fire*

*Protection District No. 5 v. City of Moses Lake*, 150 Wash 2d 791, 814, 83 P3d 419 (2004) (en banc) ('[T]he citizens of the State have no fundamental right of citizenship to seek annexation. Nor do they have any such right to prevent annexation. The power is entirely that of the legislature, which may delegate to the cities.')."

*Kane*, 202 Or App at 435 n 4; *see also Mid-County Future Alternatives v. City of Portland*, 310 Or 152, 166, 795 P2d 541 (1990) (rejecting argument that, "as a matter of constitutional law," residents or property owners must "be allowed to vote on any annexation to which they might be subjected" on the ground that "[t]here is no federal constitutional right to vote on municipal annexations"). Accordingly, petitioners' reliance on *Kramer* and related cases squarely poses the issue that we deferred in our analysis of their claims under Article I, section 20, that is, whether ORS 222.111(5) *requires* the legislative body of a city to submit a proposal for annexation to the electors of the territory proposed for annexation and then, in conjunction with ORS 222.170(1), selectively withdraws that right from some electors.

We disagree with petitioners' interpretation of the statute. ORS 222.111(5) provides for an election only in limited and conditional circumstances; an election is to be held only when an annexation proceeding is initiated by a city council or a petition of property owners under ORS 222.111(2). By its terms, ORS 222.111(5) confers no right to an election if a triple majority of property owners in the territory consents to the annexation within the time specified by the statute. If that happens, ORS 222.170(1) provides that an election in the territory proposed to be annexed is not required, and the right to an election under ORS 222.111(5) that may arise under other circumstances does not exist.

The surrounding statutory framework confirms that conclusion. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (court discerns legislative intent first by examining text and context of statute). ORS 222.120, which, as noted, sets out an exemption from elections by city electors, states that, "[e]xcept when expressly required to do so by the city charter, the legislative body of a city is not required to submit a proposal for annexation of territory to the electors of the city for their approval

or rejection." The statutory framework thus creates no generalized right to vote on annexations, either for electors of the city or electors of the territory proposed for annexation. Rather, it establishes several alternative methods of annexing property to a city that depend on the choice of the city's legislative body. With respect to territory to be annexed, for example, the city's legislative body may choose either to hold a vote of the electors of that territory, ORS 222.111(5), or to obtain the consent of a triple majority of the territory's property owners, ORS 222.170(1). Similarly, with respect to the city, the legislative body may choose to hold a vote of the city's electors, ORS 222.111(5), or dispense with such a vote and hold a public hearing instead, ORS 222.120(2). Viewed accordingly, ORS 222.111(5) does not establish a generalized right to vote on an annexation proposal that is then withdrawn for certain voters. To the contrary, the right to vote on annexation decisions is conferred by statute only in certain defined circumstances.

Petitioners remonstrate that the foregoing construction of the statutory framework creates too fine a line between voting and other means of approving annexations, such as the consent procedure authorized by ORS 222.170(1). As petitioners see things, that procedure provides a form of voting to some electors even though it "only is the decision to authorize the city to go ahead with the annexation without an election if the city so chooses." Petitioners also urge that, because the triple majority scheme "touches on" and "burdens" the right to vote, it is subject to strict scrutiny under the Equal Protection Clause. Petitioners rely on *Kramer* and other cases holding that, in the absence of a compelling state interest, laws that deny certain residents the right to vote in non-special-interest elections on grounds other than residence, age, or citizenship violate the Equal Protection Clause. *See, e.g., Hill,* 421 US at 297 (invalidating a state law tying voting eligibility to property ownership in elections to approve issuance of bonds to finance a city library); *Cipriano v. City of Houma,* 395 US 701, 704, 89 S Ct 1897, 23 L Ed 2d 647 (1969) (striking down a state law that limited the vote in a municipal bond election to property taxpayers); *Hayward,* 573 F2d at 190 (rejecting a statutory scheme that allowed property owners to nullify a vote on annexation by the public

at large); *Curtis v. Board of Supervisors*, 7 Cal 3d 942, 501 P2d 537 (1972) (invalidating a statutory scheme that allowed property owners to halt or forestall an election).

We are not persuaded by petitioners' argument. Because there is no fundamental right to vote in municipal annexation decisions, we will not blur the line drawn in *Kramer* between a legislative choice whether to authorize elections and a legislative determination of electoral qualifications. The triple majority statutory framework set out in ORS 222.170 falls, by its terms, in the former category, not the latter. Accordingly, we conclude that the traditional rational basis standard, rather than strict scrutiny, is applicable to petitioners' equal protection challenge. As discussed, the statutory scheme satisfies the rational basis standard.

To summarize: Petitioners are not members of a suspect class, and the triple majority scheme satisfies the rational basis test required by Article I, section 20, of the Oregon Constitution. Because the triple majority annexation method provided in ORS 222.170(1) does not create a generalized right to vote on municipal annexation decisions, because no such right exists under the United States Constitution, and because the statutory scheme satisfies the rational basis standard, it does not violate the Equal Protection Clause of the Fourteenth Amendment.

Affirmed.